ACCEPTED
13-14-00726-cv
THIRTEENTH COURT OF APPEALS
CORPUS CHRISTI, TEXAS
6/4/2015 3:59:29 PM
DORIAN RAMIREZ
CLERK

No. 13-14-00726-CV

IN THE COURT OF APPEALS FOR THE
THIRTEENTH DISTRICT OF TEXAS AT CORPUS CHRISTI-EDINBURG

FILED IN
13th COURT OF APPEALS
CORPUS CHRISTI/EDINBURG, TEXAS
6/4/2015 3:59:29 PM
CECILE FOY GSANGER
Clerk

LATASHA FREEMAN,
*Appellant,*

v.

AMERICAN K-9 DETECTION SERVICES, LLC AND
HILL COUNTRY DOG CENTER, LLC,
*Appellees.*

On Appeal from the 198th Judicial District Court
Bandera County, Texas
Cause No. CV-13-246

BRIEF OF APPELLEE
AMERICAN K-9 DETECTION SERVICES, LLC

James M. Parker
State Bar No. 15488710
jparker@namanhowell.com
NAMAN, HOWELL, SMITH & LEE
10001 Reunion Place, Suite 600
San Antonio, Texas 78216
Telephone: (210) 731-6364
Facsimile: (210) 785-2964

Wallace B. Jefferson
State Bar No. 00000019
wjefferson@adjtlaw.com
Rachel A. Ekery
State Bar No. 00787424
rekery@adjtlaw.com
Amy Warr
State Bar No. 00795708
awarr@adjtlaw.com
ALEXANDER DUBOSE JEFFERSON &
   TOWNSEND LLP
515 Congress Avenue, Suite 2350
Austin, Texas 78701-3562
Telephone: (512) 482-9300
Facsimile: (512) 482-9303

ATTORNEYS FOR APPELLEE AMERICAN K-9 DETECTION SERVICES, LLC
**Oral Argument Requested**

# TABLE OF CONTENTS

Table of Contents ................................................................................................i

Index of Authorities ......................................................................................... iii

Statement Regarding Oral Argument ....................................................................iv

Issues Presented .................................................................................................vi

Statement of Facts .............................................................................................1

Summary of the Argument....................................................................................5

Argument............................................................................................................8

I.     The trial court correctly granted AMK9's plea to the jurisdiction.................8

    A.     Because military decisions are potentially responsible for all or part of Freeman's alleged injuries, the political-question doctrine bars jurisdiction .................................................................................8

        1.     The political-question doctrine generally shields military decisions from judicial review ...................................................9

        2.     If the parties' claims or defenses require analysis of military decisions, the claim is a political question.................11

        3.     AMK9's defense that the Army caused all or part of Freeman's alleged injury makes her claim nonjusticiable.......19

    B.     Freeman's claim should be dismissed because it is preempted under federal law ...............................................................................27

        1.     The Federal Tort Claims Act is jurisdictional in Texas courts.................................................................................27

        2.     Federal policy under the FTCA preempts Freeman's claims .................................................................................27

    C.     Because AMK9 was exercising discretion in performing a governmental function, it is entitled to absolute official immunity ...... 33

    D.     AMK9 is immune under the Defense Production Act of 1950..........39

II.      The trial court correctly denied Freeman's request to replead......................42

III.     The trial court's grant of AMK9's responsible-third-party designation
         was correct ...............................................................................................44

Conclusion and Prayer .......................................................................................44

Certificate of Service ........................................................................................46

Certificate of Compliance ................................................................................47

**Cases**

*Ackerson v. Bean Dredging LLC*,
589 F.3d 196 (5th Cir. 2009) ...............................................................41

*Allen v. Albin*,
97 S.W.3d 655 (Tex. App.—Waco 2002, no pet.) .............................................24

*Baker v. Carr*,
369 U.S. 186 (1962)...............................................................10, 11, 18

*Barr v. Matteo*,
360 U.S. 564 (1959)...............................................................33

*Beebe v. Wash. Metro. Area Transit Auth.*,
129 F.3d 1283 (D.C. Cir. 1997)...............................................................34

*Boyle v. United Techs.*,
47 U.S. 500 (1988)...............................................................28

*Brown & Gay v. Olivares*,
2015 WL 1897646 (Tex. Apr. 24, 2015)...............................................................41

*Bushnell v. Mott*,
254 S.W.3d 451 (Tex. 2008) (per curiam) ...............................................................24

*Carmichael v. Kellogg, Brown & Root Servs., Inc.*,
572 F.3d 1271 (11th Cir. 2009) ...............................................................9, 12, 13, 26

*Del Lago Partners, Inc. v. Smith*,
307 S.W.3d 762 (Tex. 2010) ...............................................................24

*Dugger v. Arredondo*,
408 S.W.3d 825 (Tex. 2013) ...............................................................17

*Fisher v. Halliburton*,
667 F.3d 602 (5th Cir. 2012) ...............................................................16, 17

*Gilligan v. Morgan*,
413 U.S. 1 (1973)...............................................................9, 13, 21

*Gonzales v. State Farm Lloyds*,
No. 13-05-00730-CV, 2006 WL 2327259 (Tex. App.—Corpus
Christi-Edinburg Aug. 10, 2006) (mem. op.) ......................................................8

*Greater Houston Transp. Co. v. Phillips*,
801 S.W.3d 523 (Tex. 1990) .......................................................................24

*Harris v. Kellogg Brown & Root Servs., Inc.*,
724 F.3d 458 (3rd Cir. 2013) .........................................14-16, 19, 21, 26, 28-32

*Hercules, Inc. v. United States*,
24 F.3d 188 (Fed. Cir. 1994). .....................................................................40

*Hercules Inc. v. United States*,
516 U.S. 417 (1996).................................................................................40

*Houston Cmty. Hosp. v. Blue Cross & Blue Shield of Tex., Inc.*,
481 F.3d 265 (5th Cir. 2007) .......................................................................34

*JCW Elecs., Inc. v. Garza*,
257 S.W.3d 701 (Tex. 2008) .......................................................................26

*Johnson v. United States*,
170 F.2d 767 (9th Cir. 1948) ............................................................... 29-32

*Jones v. Halliburton*,
791 F.Supp.2d 567 (S.D. Tex. 2011)...........................................................6, 38

*Koepke v. Martinez*,
84 S.W.3d 393 (Tex. App.—Corpus Christi 2002, pet. denied) ................... 23-25

*Koohi v. United States*,
976 F.2d 1328 (9th Cir. 1992) .....................................................................29

*Labaj v. VanHouten*,
322 S.W.3d 416 (Tex. App.—Amarillo 2010, pet. denied) .............................24

*Lane v. Halliburton*,
529 F.3d 548 (5th Cir. 2008) .............................5, 6, 8-11, 16-19, 26

*Marbury v. Madis*on,
5 U.S. 137, 1 Cranch 137 (1803) .................................................................5

iv

*Martin v. Halliburton*,
 618 F.3d 476 (5th Cir. 2010) ...............................................................41

*McManaway v. KBR, Inc.*,
 554 Fed. App'x. 347 (5th Cir. 2014)
 (dissent to denial of reh'g en banc).......................... 5, 11, 17, 18, 20, 26, 31-33

*Mellon Mortg. Co. v. Holder*,
 5 S.W. 3d 654 (Tex. 1999).................................................................23

*Merkulov v. United States Park Police*,
 __ F.Supp.3d __, Civil Action No. 14-0854 (BAH), 2014 WL
 6743608 (D.D.C. Dec. 1, 2014) .........................................................27

*Mills v. Warner Lambert Co.*,
 157 S.W.3d 424 (Tex. 2005) (per curiam) ......................................27

*Murray v. Northrop Gruman Info. Tech., Inc.*,
 444 F.3d 169 (2d Cir. 2006) ....................................................... 34-36

*Nabors Well Servs., Ltd. v. Romero*,
 456 S.W.3d 553 (Tex. 2015) ...............................................17, 19, 22

*Neeley v. W. Orange-Cove Consol. Indep. Sch. Dist.*,
 176 S.W.3d 746 (Tex. 2005) ..............................................................10

*Palsgraf v. Long Island R. Co.*,
 248 N.Y. 339, 162 N.E. 99 (1928)...............................................23, 25

*Saleh v. Titan Corp.*,
 580 F.3d 1 (D.C. Cir. 2009)...................................................... 28-31, 33

*San Antonio Water Sys. v. Nicholas*,
 __S.W.3d __, 2015 WL 1873217 (Tex. Apr. 24, 2015)...................34

*Taylor v. Kellogg Brown & Root Servs., Inc.*,
 658 F.3d 402 (4th Cir. 2011) ..................................... 13-15, 19, 21, 26

*Tex. Dep't of Parks & Wildlife v. Miranda*,
 133 S.W.3d 217 (Tex. 2004) ...........................................................42

*U.S. v. Munoz-Flores*,
 495 U.S. 385 (1990).............................................................................9

*United States v. Bradshaw*,
  840 F.2d 871 (11th Cir. 1988) ...............................................................41

*United States v. Vertac Chem. Corp.*,
  46 F.3d 803 (8th Cir. 1995) ...................................................................40

*Viehdeffer v. Tryon*,
  2012 WL 3746372 (W.D.N.Y. Aug. 28, 2012) (unpublished).....................36, 37

*Westfall v. Erwin*,
  484 U.S. 292 (1988).......................................................... 7, 33-35

*Yearsley v. W.A. Ross Constr. Co.*,
  309 U.S. 18 (1940)............................................................................41

**Constitution and Statutes**

28 U.S.C. §1346(b)(1).............................................................................27

28 U.S.C. §2671 .....................................................................................27

28 U.S.C. §2674 .....................................................................................27

28 U.S.C. §2679(d) ................................................................................34

28 U.S. C. §2680(a) ...............................................................................28

28 U.S.C. §2680(j) ............................................................... 27-29, 32

42 U.S.C. §§1651-54.........................................................................6, 38

50 U.S.C. Appendix §2061 *et. seq.*..................................................39

50 U.S.C. Appendix §2157 .............................................................39, 40

50 U.S.C. §2071(a) ................................................................................39

50 U.S.C. §2071(a)(1).............................................................................39

TEX. CIV. PRAC. & REM. CODE 33.002(a) ..............................................26

TEX. CIV. PRAC. & REM. CODE §33.003.......................................8, 17, 22

TEX. CIV. PRAC. & REM. CODE §33.004(g)(1) .......................................44

U.S. Const. art. II, §2, cl. 1 .................................................................11

**Other Authorities**

http://news.nationalgeographic.com
/news/2003/04/0409_030409_militarydogs.html (Apr. 9, 2003) .........................2

http://www.npr.org/2013/03/10/173815691/sniffing-out-bombs-in-
afghanistan-a-job-thats-gone-to-the-dogs (Mar. 8, 2013) ...................................2

http://www.telegraph.co.uk/news/10399699/Four-military-dogs-
killed-in-action-in-Afghanistan.html (Oct. 25, 2013) ..........................................2

http://www.wsj.com/articles/military-dogs-sniff-out-ieds-save-lives-
1414772453 (Oct. 31, 2014)................................................................................2

Remembering CIA's Heroes: Johnny Micheal Spann,
https://www.cia.gov/news-information/featured-story-
archive/johnny-micheal-spann.html (last visited June 3, 2015)...........................1

www.en.wikipedia.org/wiki/Forward_operating_base#Active_FOBs_i
n_Afghanistan (last visited May 20, 2015) ..........................................................1

www.irs.gov/uac/Combat-Zones (last visited May 20, 2015)..................................1

## STATEMENT REGARDING ORAL ARGUMENT

The unusual context of this appeal—alleged injuries that occurred on a U.S. military base in Afghanistan—gives rise to jurisdictional bars that have been frequently litigated in the federal courts but not in Texas courts. Because the jurisdictional issues are legally complex and novel to Texas courts, oral argument will assist the Court.

## STATEMENT OF THE CASE

*Nature of the Case:*
Personal injury action against military contractor providing U.S. Defense Department with canine teams to detect improvised explosive devices and narcotics. Appellant alleges that the contractor's working dog bit her at a U.S. forward-operating base in a war zone in Afghanistan.

*Parties in the Trial Court:*
*Plaintiff*:  LaTasha Freeman

*Defendants*: American K-9 Detection Services, LLC ("AMK9"), and Hill Country Dog Center, L.L.C ("HCDC").

*Trial Court:*
Hon. M. Rex Emerson, 198th District Court, Bandera County

*Trial Court Proceedings:*
AMK9 filed a plea to the jurisdiction based on the political-question doctrine, the combatant-activities exception to the Federal Tort Claims Act, shared or derivative immunity, and the Defense Production Act of 1950.

*Trial Court's Disposition:*
Granted plea to the jurisdiction. *See* App. 1.

*Parties in the Court of Appeals:*
Appellant:  Freeman
Appellees: AMK9 and HCDC

## ISSUES PRESENTED

1.    Under federal "battlefield tort" precedent, the political-question doctrine renders a claim against a government contractor nonjusticiable if the contractor asserts that military decision-making contributed to cause the harm. In this case, the defendant contractor asserts that the design of Army kennels contributed to the dog's escape and alleged attack on the plaintiff. Should the plaintiffs' claims be dismissed as nonjusticiable?

2.    Under federal "battlefield tort" precedent, the policy animating the Federal Tort Claims Act's combatant-activities exception preempts tort suits against government contractors if (1) the contractors' activities were necessary to and in direct connection with combatant activities and (2) the military retained command authority. In this case, the contractor served on a forward-operating Army base in a war zone in Afghanistan performing narcotics and explosive detection alongside military troops, and the Army retained command over those services.

    a.    Are the plaintiff's claims preempted?

    b.    Does preemption deprive Texas courts of jurisdiction because federal district courts have exclusive, original jurisdiction over suits under the Federal Tort Claims Act?

3.    Does the defendant contractor have absolute official immunity because the government delegated to it a quintessential governmental function, and it performed a discretionary act in the course and scope of its duties?

4.    The Defense Production Act of 1950 provides immunity from suit under "rated" contracts, which are deemed by the President of the United States to be necessary or appropriate to promote the national defense. The defendant contractor's contract with the Army was a rated contract. Should the plaintiff's suit be dismissed?

**Parties**

LaTasha Freeman, a civilian contractor administrative clerk with Honeywell, was stationed at Camp Mike Spann[1] near Mazar-e-Sharif, in Afghanistan.  This base is in the heart of a military combat zone.[2]  1 CR 9; 1 RR 10. Camp Mike Spann is a United States Army Forward Operating Base—a secured military position supporting tactical combat operations.[3]

Defendant American K-9 Detection Services, LLC ("AMK9") provides the United States Armed Forces with teams of contract working dogs and handlers trained to detect improvised explosive devices and narcotics.  1 CR 477 (¶ 1.1). Defendant Hill Country Dog Center, LLC ("HCDC") trained dogs and handlers in Texas. 1 CR 9.

AMK9 teams train in the United States, fly to Kandahar or Bagram Air Bases, and deploy throughout Afghanistan's Combined Joint Operations Area.  1 CR 477. The U.S. military has its own canine-detection teams, but not enough; it needs

---

[1] Johnny Micheal Spann, an Auburn University graduate, was the first American killed in combat during the United States' invasion of Afghanistan in 2001.  *See* Remembering CIA's Heroes: Johnny Micheal Spann, https://www.cia.gov/news-information/featured-story-archive/johnny-micheal-spann.html (last visited June 3, 2015).

[2] *See* www.irs.gov/uac/Combat-Zones (last visited May 20, 2015).

[3] See www.en.wikipedia.org/wiki/Forward_operating_base#Active_FOBs_in_Afghanistan (last visited May 20, 2015).

contract teams "to execute force protection requirements in support of combat operations." 1 CR 477 (¶ 1.1). This includes detection of IEDs. *See* 1 CR 400.

Canine detection teams are an essential component of the U.S. military's war effort. "IEDs . . . are the No. 1 killer of civilians and troops in Afghanistan." http://www.npr.org/2013/03/10/173815691/sniffing-out-bombs-in-afghanistan-a-job-thats-gone-to-the-dogs (Mar. 8, 2013). Canine-detection teams have proven to be the most effective counter to this threat. After spending $19 billion on high-tech innovations, the Pentagon concluded that "the best weapon against IEDs was still a handler and his dog." http://www.wsj.com/articles/military-dogs-sniff-out-ieds-save-lives-1414772453 (Oct. 31, 2014). "On average, these four-footed soldiers are 98 percent accurate in their detection abilities . . . and depending on the task and climate, can work up to 12 hours a day." http://news.nationalgeographic.com/news/2003/04/0409_030409_militarydogs.html (Apr. 9, 2003). Canine-detection teams work in treacherous conditions, and some have been killed in action. http://www.telegraph.co.uk/news/10399699/Four-military-dogs-killed-in-action-in-Afghanistan.html (Oct. 25, 2013). Freeman admits that "[t]he job that they do as far as training and having their dogs go out and sniff for bombs to protect our soldiers out in the field is absolutely critical to protecting our soldiers, protecting our civilians . . ." 1 RR 12.

**The alleged dog attack at a U.S. military base in Afghanistan**

Freeman alleges that she was waiting by a gate to escort a vehicle into Camp Mike Spann when "Kallie," an AMK9 contract working dog, escaped the adjacent kennel through an open door and attacked her. 1 CR 564. AMK9 alleges that Kallie got out of the kennel by jumping over an internal partition between pens and then escaping through an open door. 1 RR 24; 1 CR 398, 401. The internal partition did not extend all the way to the kennel's ceiling. *Id*. As Freeman admits, the Army designed and constructed the kennel, and required AMK9 to use it. 1 RR 14; 1 CR 266; 2 CR 1293 (¶7.1.1). After the incident, tops were put on the kennels, and handlers were instructed to keep the doors closed at all times. 1 CR 398, 401.

In her original petition, Freeman alleged that Kallie bit her three times, resulting in physical injury, before a bystander pulled the dog away. 1 CR 5-9, 564. She alleged that the attack caused a nerve condition called "complex regional pain syndrome," completely disabling her and making her unable to work. 1 RR 11. But in both a handwritten complaint and an email written just days after the alleged attack, Freeman did not claim that she was injured. 1 CR 399; 2 CR 1388. The only after-effect Freeman reported was a torn coat. *Id*. AMK9's contemporaneous incident report states that there was a "[s]mall puncture mark on left sleeve of jacket" but no physical injury ("Nature of Injury NONE") ("Injured Person(s) NONE")

("Details of First Aid/ Medical Attention/ Hospitalization/ Evacuation/ Leave NONE"). 1 CR 400-01.

Freeman sued AMK9 and HCDC for negligence and strict liability, seeking more than $1 million in pain and suffering, mental anguish, medical expenses, and lost wages. 1 CR 10-11, 15; 1 RR 10. She alleges that AMK9 did not properly restrain the "dangerous" dog, train its handler, or warn base personnel. 1 CR 10-11. She alleges that HCDC trained the dog to attack despite awareness of its dangerous propensities. 1 CR 9-10, 12. In its answer, AMK9 denied that Freeman was attacked or injured or that Kallie was a dangerous canine with aggressive propensities. Alternatively, AMK9 designated the Army as a responsible third party. 1 CR 221 (first amended answer), 436-38 (RTP designation).

AMK9 sought dismissal on four independent jurisdictional grounds: the political-question doctrine, the combatant-activities exclusion to the Federal Tort Claims Act, derivative sovereign immunity,[4] and the Defense Production Act of 1950. 1 CR 215-17. The trial court granted the plea, 1 CR 612, and Freeman appealed.

---

[4] In proceedings below, AMK9 argued that it was entitled to derivative sovereign immunity. That argument has been called into question by a recent decision of the Texas Supreme Court. Accordingly, AMK9 has elected not to advance the derivative immunity argument in this brief. Nevertheless, because the law in this area develops rapidly, AMK9 will promptly alert this Court if a subsequent decision is in line with AMK9's earlier stance.

Our recent wars in Iraq and Afghanistan have been marked by an "explosion in the military's use of contractors to wage war." *McManaway v. KBR, Inc.*, 554 Fed. App'x. 347, 353 (5th Cir. 2014) (Jones, J., dissenting to denial of reh'g en banc). In fact, "the military finds the use of civilian contractors in support roles to be an essential component of a successful wartime mission." *Lane v. Halliburton*, 529 F.3d 548, 554 (5th Cir. 2008). This is a suit against a government contractor for a "battlefield tort," *i.e.*, an alleged civil wrong for an action or decision that occurred on or near a combat zone, triggering important threshold questions regarding the power of courts to adjudicate military operations in time of war. This appeal presents four such issues.

**The Political Question Doctrine**. *Marbury v. Madison* famously declared: "It is emphatically the province and duty of the judicial department to say what the law is." 5 U.S. 137, 177, 1 Cranch 137, 177 (1803). Lesser known, but fundamental to our form of government, is *Marbury's* holding that the judiciary is not the appropriate forum for all questions: "Questions, in their nature political, or which are, by the constitution and laws, submitted to the executive, can never be made in this court." *Id.* at 170.

This case involves such a question, because Freeman's claims would require a jury to decide whether the United States Army properly equipped its military base.

5

In the military context, a trial court's exercise of jurisdiction could frustrate the armed forces' quest to defeat a United States adversary. The political question doctrine bars a claim that weakens the autonomy of military decision-making. *Lane*, 529 F.3d at 558.

Under well-developed federal jurisprudence regarding the political-question doctrine's application to battlefield torts, Freeman's claims are non-justiciable because the Army's negligence in causing Freeman's alleged injury is directly at issue. Under Texas's proportionate-responsibility system, this allegation means that the fact-finder must evaluate the Army's wartime decision-making. Because such review is impermissible, Freeman's claims cannot be adjudicated in a Bandera County court. However, Freeman is not without a remedy, as defense contractors providing services to the Armed Forces overseas (such as Freeman's employer, Honeywell) must carry workers' compensation coverage pursuant to the Defense Base Act. *See* 42 U.S.C. §§1651-54; *Jones v. Halliburton*, 791 F.Supp.2d 567, 582 (S.D. Tex. 2011).

**The Combatant-Activities Exception to the Federal Tort Claims Act**. Freeman's claims are also *preempted* under federal law. The combatant-activities exception prevents suits against government contractors when their activities are integrated with the military, and the military retains operational control. Those facts

6

are present here, as AMK9 performed its explosives and narcotics detection duties jointly with Army troops.

**Absolute Official Immunity**. AMK9 is entitled to immunity under the *Westfall* doctrine because it (1) was delegated a quintessential government function and (2) performed a discretionary act within the course and scope of its duties under its contract with the Army.

**Defense Production Act of 1950**. AMK9 is immune under the Defense Production Act of 1950 because it performed under a "rated" contract essential for national defense.

**No Repleading**. Freeman did not establish the trial court's subject-matter jurisdiction, and she is not entitled to replead. She has not shown—and cannot even articulate—what additional facts could conceivably bring her claims within the court's jurisdiction.

**Responsible Third-Party Designation**. The evidence supports the Army's responsibility, at least in part, for Freeman's alleged injuries. Therefore, the trial court could not have denied, and therefore correctly granted, AMK9's designation of the Army as a responsible third party under Texas's proportionate responsibility statute.

Accordingly, this Court should affirm the trial court's grant of AMK9's plea to the jurisdiction and dismiss Freeman's claims.

## I.    The trial court correctly granted AMK9's plea to the jurisdiction.

AMK9 advanced four grounds in its plea to the jurisdiction.  1 CR 215-17. The trial court granted the plea without specifying which ground or grounds it relied on, 1 CR 612 (App. 1); therefore, Freeman must negate all four grounds to prevail in her appeal. *See Gonzales v. State Farm Lloyds*, No. 13-05-00730-CV, 2006 WL 2327259, at *2 (Tex. App.—Corpus Christi-Edinburg Aug. 10, 2006) (mem. op.) (summary judgment).

### A.    Because military decisions are potentially responsible for all or part of Freeman's alleged injuries, the political-question doctrine bars jurisdiction.

In many battlefield-tort cases, causation is "the most critical element for political question analysis." *Lane*, 529 F.3d at 565. Based on evidence that the Army controlled the existence and design of the Camp Spann kennels, AMK9 asserts that the Army caused some or all of Freeman's alleged injuries.   Under Texas's proportionate responsibility scheme, the jury must apportion responsibility among each person who "in any way" causes or contributes to cause an injury. TEX. CIV. PRAC. & REM. CODE §33.003. No matter how Freeman couches her claims, this case will require Texas courts to evaluate (1) the Army's choice of a kennel design that allowed Kallie to scale an internal wall and escape, and (2) the Army's contractual requirement that AMK9 use Army kennels. *See* 1 CR 266, 398, 401; 2 CR 1293

(¶7.1.1); 1 RR 14. These are battlefield-related questions that no jury, and no court, can second-guess. The political-question doctrine bars jurisdiction.

### 1. The political-question doctrine generally shields military decisions from judicial review.

As the Fifth Circuit has observed, "an arena in which the political question doctrine has served one of its most important and traditional functions" is to "preclude[e] judicial review of decisions made by the Executive during wartime." *Lane*, 529 F.3d at 558.[5] Not all cases involving the military fall into this category., *Carmichael v. Kellogg, Brown & Root Servs., Inc.*, 572 F.3d 1271, 1281 (11th Cir. 2009), but the political-question doctrine is particularly applicable to wartime military decisions:

> [i]t would be difficult to think of a clearer example of the type of governmental action that was intended by the Constitution to be left to the political branches . . . . Moreover, it is difficult to conceive of an area of governmental activity in which the courts have less competence. The complex subtle, and professional decisions as to the composition, training, equipping, and control of a military force are essentially professional military judgments, subject always to civilian control of the Legislative and Executive Branches. The ultimate responsibility for these decisions is appropriately vested in branches of the government which are periodically subject to electoral accountability.

*Lane*, 529 F.3d at 558-59 (quoting *Gilligan v. Morgan*, 413 U.S. 1, 10 (1973)).

---

[5] Stated another way, the doctrine is "designed to restrain the Judiciary from inappropriate interference in the business of the other branches of Government." *U.S. v. Munoz-Flores*, 495 U.S. 385, 394 (1990).

9

*Baker v. Carr*, 369 U.S. 186 (1962), "define[s] nonjusticiable political questions." *See Neeley v. W. Orange-Cove Consol. Indep. Sch. Dist.*, 176 S.W.3d 746, 778 (Tex. 2005) (assuming, without deciding, that *Baker* governs political questions even under Texas Constitution). As the Fifth Circuit has observed, *Baker* "is not satisfied by 'semantic cataloguing' of a particular matter as one implicating 'foreign policy' or 'national security.'" *Lane*, 529 F.3d at 558 (quoting *Baker*, 369 U.S. at 216). "Instead, *Baker* demands a 'discriminating inquiry into the precise facts and posture of the particular case' before a court may withhold its own constitutional power to resolve cases and controversies." *Id.* (quoting *Baker*, 369 U.S. at 216).

The six *Baker* factors are:

(1) "a textually demonstrable constitutional commitment of the issue to a coordinate political department;" or

(2) "a lack of judicially discoverable and manageable standards for resolving it;" or

(3) the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion;" or

(4) "the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government;" or

(5) "an unusual need for unquestioning adherence to a political decision already made;" or

(6) "the potentiality of embarrassment from multifarious pronouncements by various departments on one question."

10

369 U.S. at 217. "The inextricable presence of one or more of [the *Baker*] factors will render the case nonjusticiable . . . ." *Lane*, 529 F.3d at 558.

**2. If the parties' claims or defenses require analysis of military decisions, the claim is a political question.**

Because the Constitution's text commits to the President controversies regarding foreign affairs and the armed forces, the political-question doctrine precludes judicial review of cases involving military decision-making. *See* U.S. CONST. art. II, §2, cl. 1. In the wake of our recent wars in Iraq and Afghanistan, federal courts have developed a significant body of political-question jurisprudence—particularly its application to military contractors' actions on or near the battlefield.

In federal courts' battlefield-tort decisions, *Baker*'s "discriminating inquiry" requires an in-depth evaluation of claims and defenses. The key issue is whether the parties' claims and defenses implicate "the Executive's wartime decision-making." *Lane*, 529 F.3d at 557. If AMK9's actions "form the sole issues," Freeman's battlefield-tort claim is justiciable. *Id*. But if resolving the claim would require the factfinder to analyze military decisions, then the claim is a non-justiciable political question. *Id*.; *see also McManaway*, 554 Fed. App'x. at 350 (Jones, J., dissenting to denial of reh'g en banc) ("[C]ases involving competing claims of negligence by the United States military and a contractor are barred from federal court adjudication.").

11

**Eleventh Circuit**. Numerous federal circuit courts have applied the political-question doctrine to suits against military contractors for torts on or near the battlefield. The Eleventh Circuit dismissed a negligence suit by an injured soldier against a civilian-contractor truck driver for an accident along an Iraq convoy route. *Carmichael*, 572 F.3d at 1288. The fuel truck overturned on a sharp curve, pinning the soldier—a passenger—underneath. *Id*. at 1278. The soldier brought what on the surface was a typical tort action, alleging the truck driver traveled at excessive speed, failed to keep a proper lookout, and failed to properly inspect his vehicle. *Id*. at 1279.

The Eleventh Circuit nevertheless held that the political question doctrine barred the tort action. The soldier's suit would require examination of military judgments made in the moment of war, including nearly all convoy travel on the day of the incident. *Id*. at 1280. (applying the first and second *Baker* factors: "a textually demonstrable constitutional commitment of the issue to a coordinate political department," and "a lack of judicially discoverable and manageable standards for resolving it"). The court first noted that the Army had almost complete control over the fuel convoy, which made it likely that that the suit would implicate military decisions. *Id*. at 1283-84.

However, "even assuming [the driver] bore some blame for the accident, none of the facts cited by Carmichael shows that [the driver] would be the *only* party to

12

blame." *Id*. at 1286. "Whatever evidence Carmichael would present in an effort to show [the driver's] negligence, KBR would surely [present other evidence] to argue that the military convoy commander was negligent . . . ." *Id*. Because "KBR would inevitably . . . try to show that unsound military judgments . . . were either supervening or concurrent causes of the accident . . . . litigation involving these issues is undeniably foreclosed by the political question doctrine." *Id*.

Importantly, the Eleventh Circuit recognized that the political-question doctrine's purview is not limited to battlefield or combat activities *per se*. *Id*. at 1287-88 (collecting cases applying political-question doctrine to military training policies, conscription, and location of military bases). "[S]afe[] deliver[y of] vital military supplies through hostile territory in war time . . . [is] among the 'complex, subtle, and professional decisions as to the composition, training, equipping, and control of a military force' that are 'essentially professional military judgments' and . . . properly insulated from judicial review.'" *Id*. at 1288 (quoting *Gilligan*, 413 U.S. at 10); *see also Taylor v. Kellogg Brown & Root Servs., Inc.*, 658 F.3d 402, 406, 408 (4th Cir. 2011) (applying political-question doctrine to dismiss suit regarding electrocution during generator repair that occurred on Army base near Fallujah, Iraq—in "combat theatre" but not in combat).

**Fourth Circuit**. The Fourth Circuit has also held that a contractor's defense injects a political question into a battlefield-tort suit. *See Taylor*, 658 F.3d at 411-

13

12. In *Taylor*, a marine was electrocuted while trying to install a backup generator at an Army base in Iraq. He alleged that KBR, the contractor in charge of maintaining electrical facilities on the base, disregarded explicit instructions not to turn on the generator. Its activation caused the soldier's injuries.

Unlike in *Carmichael*, the Army did not have pervasive control. Indeed, the contract with the Army assigned KBR complete discretion over generator maintenance and safety of base residents during KBR operations. *Id*. at 411. Nonetheless, the court held that KBR's contributory-negligence defense introduced non-justiciable political questions. *Id*. at 411-12. Deciding "the merits of Taylor's negligence claim would require the judiciary to question 'actual, sensitive judgment made by the military,'" such as whether Taylor and his fellow marines had made a reasonable decision to work on the generator, and whether the base leadership had acted reasonably in determining the allocation of backup power generators to various areas of the base. *Id*. As a result, the claim was non-justiciable. *Id*.

**Third Circuit**. The Third Circuit has also held that a contractor's defense must be appraised when assessing whether the political-question doctrine applies. *Harris v. Kellogg Brown & Root Servs., Inc.*, 724 F.3d 458, 465-66 (3rd Cir. 2013). In *Harris*, a soldier was electrocuted while showering in a military barracks in Iraq. *Id*. at 463. The barracks was in an old building known to have significant electrical

14

problems, and KBR allegedly failed to ground and bond the shower's water pump. *Id*.

As in *Taylor*, KBR had—through its contract with the military—significant discretion over how to accomplish repairs at the barracks, but analysis of the claims and defenses was nevertheless needed to decide whether the claim involved a political question. *Id*. at 467. Although the plaintiff's claims did not in themselves raise a political question, *id*. at 467-69, KBR's defenses potentially did. *Id*. at 469. KBR alleged that the military's actions in providing unsafe barracks were the sole cause of the soldier's death. *Id*. at 470. Ultimately, the Third Circuit concluded that the political-question determination depended on which state's law applied. *Id*. at 474. It thus remanded the case so that the district court could make a choice-of-law determination. *Id*. at 482.

Because Texas law was implicated in *Harris*, the Third Circuit's analysis is particularly instructive here. The court concluded that, *if Texas law applied*, the case would be *nonjusticiable* under the political-question doctrine. *Id*. at 474. This is because of Texas' proportionate-responsibility scheme:

> If a jurisdiction uses a proportional-liability system which assigns liability by the degree of fault, then a proximate-cause defense introduces a nonjusticiable issue. In such a system, there is simply no way to determine damages without evaluating military decisions. The fact finder cannot decide the respective degrees of fault as between a military contractor like KBR and the military without evaluating the decisions made by each—particularly, the military's decisions to house troops in unsafe barracks that would not be repaired.

15

*Id.* As support for its conclusion, the court cited *Fisher v. Halliburton*, in which the Fifth Circuit explained that Texas's proportionate-liability scheme could introduce a political question but resolved the case on other grounds. 667 F.3d 602, 621-22 (5th Cir. 2012).

**Fifth Circuit**. The Fifth Circuit has taken the same approach as the Third, Fourth, and Eleventh Circuits. *See Lane*, 529 F.3d at 564 ("Ultimately, we focus our attention on causation because it is under this element that the confluence of the Plaintiffs' proof and KBR's defense presents the greatest potential for inextricableness."). In *Lane*, civilian-contractor truck drivers sued their employers, Halliburton and KBR, for injuries they sustained when Iraqi insurgents attacked their fuel-transport convoy. *Id.* at 555. The drivers contended their employers were negligent in continuing the convoys despite awareness of a strong likelihood of attacks, and for fraud in promising them 100% safety as a condition of employment. *Id.* at 554-55. The employers alleged, instead, that the insurgents' attack and the military's failure to adequately protect the convoys caused the plaintiffs' injuries. *Id.* at 566.

The Fifth Circuit declined to dismiss the case on political-question grounds under the record presented, although it noted that "further factual development very well may demonstrate that the claims are barred." *Id.* at 567. The court held that the fraud claims "might be triable without raising a political question because the court

16

could assess [the employers'] liability by simply being aware of the information the military provided to [the employers], not second-guessing that information." *Id*. The court came to a similar conclusion as to the negligence claims, although they "move precariously close to implicating the political question doctrine." *Id*. However, the court's analysis hinged on its understanding that Texas law could impose liability on the employers as long as their conduct was *a* cause of the harm, notwithstanding a superseding or intervening cause. *See id.* at 566-67.

AMK9 submits, however, that the Circuit's understanding of Texas law is incomplete. The Circuit did not take into account Texas's proportionate-responsibility scheme, under which the trier of fact must apportion *all* causes-in-fact of the harm, including actions of any responsible third party such as the military. *See* TEX. CIV. PRAC. & REM. CODE §33.003(a). The court did not have the benefit of recent Texas jurisprudence emphasizing that all common law defenses are governed by proportionate responsibility, and the jury must consider all acts contributing in any way to cause the harm. *See Nabors Well Servs., Ltd. v. Romero*, 456 S.W.3d 553, 559 (Tex. 2015); *Dugger v. Arredondo*, 408 S.W.3d 825, 832 (Tex. 2013). In fact, a subsequent Fifth Circuit decision recognized that, when the military is designated as a responsible third party under Texas's proportionate-responsibility scheme, the political-question doctrine is "a significant issue." *Fisher*, 667 F.3d at 621; *see also McManaway*, 554 Fed. App'x. 348 n.1 (Jones, J., dissenting to denial

17

of reh'g en banc) (recognizing that when the government is designated as an RTP, "the jury [has] to formally assess a percentage of liability against [it] despite its sovereign immunity from suit").

Courts must analyze claims *and* defenses in determining whether the political question doctrine applies in battlefield tort cases. Four judges of the Fifth Circuit have opined that competing claims of causation involving the military always raise a political question, regardless of which state's law applies. *McManaway*, 554 Fed. App'x. at 351-52 (Jones, J., dissenting from denial of reh'g en banc) ("Since causation is always a necessary element, no particular tort regime can make the problem go away."). Either way, because Freeman has sued under Texas law, the Army's potential responsibility for the harm must be part of the political-question analysis.

Freeman does not discuss these federal cases as a part of her political-question analysis. Rather, she limits herself to an abstract discussion of the *Baker v. Carr* factors that ignores AMK9's defense. But neither federal precedent nor Texas law allows the Army's responsibility to be ignored. "If we must examine the Army's contribution to causation, 'political question' will loom large." *Lane*, 529 F.3d at 561.

### 3. AMK9's defense that the Army caused all or part of Freeman's alleged injury makes her claim nonjusticiable.

In assessing whether a political question exists, the Court must "look beyond the complaint" [and] consider [] how [Freeman] might prove [her] claim [] *and* how [AMK9] would defend." *Taylor*, 658 F.3d at 409; *Lane*, 529 F.3d at 565; *see also Harris*, 724 F.3d at 465-66. "[Freeman's] claims might still present unreviewable military decisions if proving those claims *or [AMK9's] defenses* necessarily requires evaluating such decisions." *Harris*, 724 F.3d at 467 (emphasis added). Freeman's claims are justiciable only if AMK9's actions "form the sole issues." *Lane*, 529 F.3d at 557.

Freeman argues that her pleadings do not implicate the kennel's design, but only (1) the dog's training, and (2) the handler's conduct *after* the dog escaped. Appellant's Br. at 6, 24-25. But Freeman cannot pre-determine the political-question analysis unilaterally. *Defenses* must be considered in the political-question analysis, and AMK9 has pleaded comparative responsibility as a defense. *See* 1 CR 219. Under Texas proportionate-responsibility law, the jury must consider and apportion *all* causes of the injury. *Nabors*, 456 S.W.3d at 560 ("[F]act-finders should consider each person's role in causing, 'in any way,' harm for which recovery of damages is sought.").

This case cannot be litigated without evaluating military decisions regarding kennel design and use. It is therefore not justiciable. *See Lane*, 529 F.3d at 557; *see*

19

*also McManaway*, 554 Fed. App'x. at 350 (Jones, J., dissenting to denial of reh'g en banc) ("[C]ases involving competing claims of negligence by the United States military and a contractor are barred from federal court adjudication."). Because of the competing claims of fault and causation, the claims are "inextricable" from the first four *Baker* factors.

The parties disagree on a decisive threshold issue of Texas law: the viability of AMK9's defense that the Army is at least partially at fault for Freeman's alleged injury. There is evidence that the Army's kennel—which the Army required AMK9 to use—contained dividers between individual enclosures that were too low, enabling Kallie to leap into another dog's unlocked enclosure and then run outside through the main kennel's open door. 1 CR 398, 401. AMK9 contends that the dividers' height was a contributing cause of Freeman's alleged injury. 1 CR 221, 436-38; 1 RR 24.

Freeman's brief discussion of the *Baker* factors ignores the importance of AMK9's defense and, therefore, does not address the applicable legal standard. But Freeman does make three arguments that deserve a response. First, she states that the kennel's design was not a "strategic" decision by the Army. Appellant's Br. at 13. She cites no authority that "strategic" is a requirement, but presumably contends that the kennel design is not important enough to be protected by the political-question doctrine. She does not offer any evidence or argument to support her

statement, nor does she dispute that the kennel's design was a but-for cause of her asserted injury.

Caution is warranted when making presumptions about the relative importance of military decisions. If viewed in isolation, the military's failure to provide a backup generator to a tank ramp, at issue in *Taylor*, might not seem "strategic." However, backup power was a limited resource at the camp, available to the "battle square," but not to other areas. *Taylor*, 658 F.3d at 406. Similarly, the military's decision to house soldiers in an old building with faulty wiring, at issue in *Harris*, might not seem strategic. But the building was chosen because it was less vulnerable than other locations to missile and mortar attacks. *Harris*, 724 F.3d at 471.

Neither the Fourth nor Third Circuits second-guessed the "strategic" nature of the military's decisions when evaluating whether the political-question doctrine applied. Likewise, there could be multiple important reasons for the kennels' design and the Army's requirement that contractors utilize them: scarcity of building materials and the need for maximum efficiency in transporting war material to remote forward-operating bases are only a few that come to mind. The limited capacity of courts to evaluate the strategic nature of military decisions confirms that the question is not part of the political-question analysis. *See Gilligan*, 413 U.S. at 10 ("Courts lack the necessary standards to review military judgments involving

"complex[], subtle, and professional decisions as to the . . . equipping . . . of a military force.").

Freeman also contends there is no evidence that the Army owed her a duty to "supply . . . non-defective kennels." Appellant's Br. at 15. She argues there is no evidence that the kennel was defective or that any defects caused Kallie to escape. *Id*. at 15-16. But AMK9 was not required to demonstrate a "defect." Negligence in design of the kennels or in the requirement that they be utilized exclusively justifies the Army's inclusion as a responsible third party. *See* TEX. CIV. PRAC. & REM. CODE §33.003(a). In any event, Freeman's alleged injuries occurred only because the dog escaped, which would not have happened had the internal kennel walls confined her. The decisions about the effectiveness of the kennel as an instrument of confinement were made by the Army—not AMK9.

Freeman argues that Texas law does not support a proportionate-responsibility question regarding the Army's fault for Freeman's alleged injuries because only a domestic animal's owner or "keeper" has a duty of care regarding the animal. Appellant's Br. at 17-19. The Army was not Kallie's owner or keeper, she argues, and thus had no duty to help prevent the alleged attack. *Id*.

But Texas law does not embrace such a cramped view of duty. Rather, the scope of a duty in any given case is governed by foreseeability. *See Nabors*, 456 S.W.3d at 565 (Tex. 2015) (recognizing "the duty everyone has to guard against

22

foreseeable risks—a duty that has been recognized at least since *Palsgraf v. Long Island R. Co.*, 248 N.Y. 339, 162 N.E. 99 (1928)"). "[F]oreseeability turns on existence of a general danger, not awareness of the exact sequence of events that produces the harm." *Id.* (citing *Mellon Mortg. Co. v. Holder*, 5 S.W. 3d 654, 655 (Tex. 1999)).

The cases Freeman cites do not contradict these longstanding principles. She relies on this Court's decision in *Koepke v. Martinez*, 84 S.W.3d 393 (Tex. App.—Corpus Christi 2002, pet. denied). In *Koepke*, Teresa Canales bought a Shar-Pei named Jackie Chan from James Koepke. *Koepke*, 84 S.W.3d at 395. Canales sent her employee, Maria Martinez, to pick up the dog. *Id.* Later, at Canales's house, the dog attacked Martinez's husband, injuring him. *Id.* Martinez's husband sued Koepke—the dog's former owner—for negligence and obtained a judgment against him. *Id.* This Court reversed, holding that Koepke had no duty as a matter of law "[b]ecause Koepke was neither the owner, nor the handler, of Jackie Chan at the time of the incident." *Id.* at 396.

Freeman suggests that *Koepke* establishes a bright-line rule for dog attacks: liability lies only against the owner or handler. Appellant's Br. at 17-19. But the Court was merely describing the most common characteristics of dog-attack claims, not setting parameters: "[t]he gist of a [dog-attack] action . . . is *usually* negligence

23

of the owner or keeper in the keeping or handling of the animal." *Koepke*, 84 S.W.3d at 396 (emphasis added).

Far from setting a hard-and-fast rule about duty, this Court employed traditional foreseeability analysis, emphasizing that the attack occurred on Canales's—not Koepke's—property, *id.*, even though this fact is not coextensive with status as the dog's owner or handler. The Court also suggested its no-duty holding is limited to the specific allegation that Koepke "mishandled" Jackie Chan. *Id.* ("Appellees cannot now argue Koepke mishandled Jackie Chan because he was neither the owner, nor the handler at the time of the incident.").[6] This statement indicates the duty analysis would be different if the plaintiff had alleged a different negligent act, or if the facts had given rise to potential premises liability. *See Del Lago Partners, Inc. v. Smith*, 307 S.W.3d 762, 767 (Tex. 2010) (recognizing that premises owner owes invitees a duty of ordinary care).

Finally, as support for its no-duty holding, this Court cited a Texas Supreme Court decision that employed traditional, case-specific foreseeability analysis. *Koepke*, 84 S.W.3d at 396 (citing *Greater Houston Transp. Co. v. Phillips*, 801

---

[6] The other decisions Freeman cites to support her no-duty rule similarly state the rule in terms of negligent-handling claims only, not negligence actions regarding dog attacks in general. *See Bushnell v. Mott*, 254 S.W.3d 451, 452 (Tex. 2008) (per curiam) (holding that owner of dog can be liable for negligent handling); *Labaj v. VanHouten*, 322 S.W.3d 416, 420-21 (Tex. App.—Amarillo 2010, pet. denied) (same); *Allen v. Albin*, 97 S.W.3d 655, 660 (Tex. App.—Waco 2002, no pet.) ("[T]he elements of an action for injuries caused by the *negligent handling* of an animal are: (1) the defendant was the owner or possessor or an animal . . . .") (emphasis added).

S.W.3d 523, 525 (Tex. 1990) (stating that cases imposing a duty to protect third parties "involve a straightforward application of the *Palsgraf* rule: '[t]he risk reasonably to be perceived defines the duty to be obeyed.'")).

*Koepke*, therefore, does not preclude AMK9 from designating the Army as an RTP and seeking to assign it fault for causing Freeman's alleged injuries. The Army had a duty even though it was neither owner nor handler of the dog in question. The Army contracted with AMK9 to provide dogs and handlers for explosive and narcotics detection, housed AMK9's dogs on the busy forward-operating base where the alleged attack occurred, and required the dogs to be housed in kennels that the Army designed and constructed. The Army required AMK9 to use Army kennels, so the Army had a duty to minimize the risk of escape by providing adequate internal dividers. The incident report and the email are evidence that the low internal dividers contributed to the dog's escape and the resulting alleged attack on Freeman. *See* 1 CR 398, 401. After the incident with Kallie, tops were put on the kennels. 1 CR 398.

Finally, Freeman contends that AMK9 had sole responsibility for kennel maintenance. Appellant's Br. at 16. This is true, but irrelevant, because AMK9 contends the design—not maintenance—of the kennel contributed to Freeman's alleged injuries. 1 CR 221, 436-38; 1 RR 24.

Citing *Harris*, Freeman also argues that any claim not implicating proportionate responsibility should proceed. Appellant's Br. at 16. But, as has been demonstrated, *all* of Freeman's claims are subject to apportionment. Chapter 33 applies to "any cause of action based on tort." TEX. CIV. PRAC. & REM. CODE 33.002(a). Freeman brought negligence and strict liability claims, 1 CR 10-11, both of which are torts. *See JCW Elecs., Inc. v. Garza*, 257 S.W.3d 701, 704 (Tex. 2008). AMK9 also asserts tortious conduct—that the Army negligently caused or contributed to cause Freeman's alleged injury. 1 CR 221 (first amended answer), 436-38 (RTP designation). Therefore, all of Freeman's claims are subject to the proportionate-responsibility statute.

For that reason, her claims "inextricably" involve a political question. This case is non-justiciable under the first four *Baker* factors. *See Harris*, 724 F.3d 474 (case is non-justiciable if Texas law applies); *Taylor*, 658 F.3d at 411-12 (political-question doctrine applies to competing claims of causation involving military decisions); *Carmichael*, 572 F.3d at 1286 (same); *see also McManaway*, 554 Fed. App'x. at 350 (Jones, J., dissenting to denial of reh'g en banc) (same) (citing *Lane*, 529 F.3d at 567).

**B.** **Freeman's claim should be dismissed because it is preempted under federal law.**

**1.** **The Federal Tort Claims Act is jurisdictional in Texas courts.**

Freeman's claims are also preempted under the combatant-activities exception to the Federal Tort Claims Act ("FTCA"). Although federal preemption does not typically divest a state court of jurisdiction, an exception applies when the preempted claim is subject to exclusive federal-court jurisdiction. *Mills v. Warner Lambert Co.*, 157 S.W.3d 424, 427 (Tex. 2005) (per curiam). Federal district courts have exclusive original jurisdiction over FTCA claims—"civil actions on claims against the United States for money damages." 28 U.S.C. §1346(b)(1); *Merkulov v. United States Park Police*, __ F.Supp.3d __, Civil Action No. 14-0854 (BAH), 2014 WL 6743608, at *4 (D.D.C. Dec. 1, 2014). Thus, if the combatant-activities exception applies to Freeman's claims, it divests Texas courts of jurisdiction.

**2.** **Federal policy under the FTCA preempts Freeman's claims.**

The FTCA is a limited waiver of the United States' sovereign immunity. 28 U.S.C. §2674. There are exceptions, one of which is for combatant activities. 28 U.S.C. §2680(j). Under that exception, the United States retains immunity for "[a]ny claim arising out of the combatant activities of the military of naval forces, or the Coast Guard, during time of war." *Id*.

Because contractors are not part of the government, the FTCA's waiver and exceptions do not apply directly to them. *See* 28 U.S.C. §2671. But the U.S.

Supreme Court has held that the FTCA expresses federal policies that impliedly preempt some state claims against government contractors providing services to the military. *Boyle v. United Techs.*, 47 U.S. 500, 511-12 (1988).

In *Boyle*, the Supreme Court held that a different FTCA exception (the discretionary-function exception) expresses a federal policy that preempts state-law tort claims. *Id.* This exception precludes suits for "[a]ny claim . . . based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused." 28 U.S. C. §2680(a). The discretionary-function exception expressed a federal policy to prevent courts from second-guessing government decisions that "often involve[] not merely engineering analysis but judgment as to the balancing of many technical, military, and even social considerations." *Boyle*, 487 U.S. at 511.

Federal circuit courts have, in turn, applied *Boyle* to a second FTCA exception: the combatant-activities exception, which preempts state-law claims "arising out of the combatant activities" of the military during wartime. *See* 28 U.S.C. §2680(j). This exception may foreclose, by means of preemption, suits against defense contractors. *Saleh v. Titan Corp.*, 580 F.3d 1, 9 (D.C. Cir. 2009). The first step is to identify the federal interest that the combatant-activities exception protects. *Harris*, 724 F.3d. at 479.

28

The three federal circuit courts to have considered the question agree that there is a unique federal interest in the management of wars. *Id.*; *Saleh*, 580 F.3d at 5-7; *Koohi v. United States*, 976 F.2d 1328, 1334 (9th Cir. 1992). They are divided, however, about the policy's scope and the applicable test. The Ninth Circuit takes the narrowest view. In a seminal decision, it defined "combatant activities" to exclude recovery for "not only physical violence, but activities necessary to and in direct connection with actual hostilities." *Johnson v. United States*, 170 F.2d 767, 770 (9th Cir. 1948). However, a more recent Ninth Circuit decision seems to protect contractors from liability only to those "against whom force is directed." *Koohi*, 976 F.2d at 1337. The District of Columbia Circuit has taken a broader view, holding that exception's purpose is "the elimination of tort from the battlefield." *Saleh*, 580 F.3d at 7.

The Third Circuit rejected *Koohi*'s approach as too narrow for the operative language, which encompasses any claim "arising out of" combatant activities. *Harris*, 724 F.3d at 480 (citing 28 U.S.C. §2680(j)). It also pointed out that such an interpretation would not prevent suits against the military for friendly fire, contrary to the statute's plain language. *Id.* It also rejected the D.C. Circuit's view of the federal policy as too broad, stating that it "loses sight of the fact that . . . the [FTCA] does not provide immunity to nongovernmental actors." *Id.* The Third Circuit held

29

that the purpose of the combat-activities exception is "to foreclose state regulation of the military's battlefield conduct and decisions." *Id*.

Regardless of its disagreement as to the exception's purpose, the Third Circuit adopted the D.C. Circuit's test, which inquires whether a contractor's services are "integrated" with combatant activities and the extent to which the military retained command authority. *Harris*, 724 F.3d at 480 (quoting *Saleh*, 580 F.3d at 9). It held the test was "well-tailored" to the exception's purpose:

> The first prong—whether the contractor is integrated into the military's combatant activities—ensures that preemption occurs only when battlefield decisions are at issue. And the second prong—whether the contractor's actions were the result of the military's retention of command authority—properly differentiates between the need to insulate the military's battlefield decisions from state regulation and the permissible regulation of harm resulting solely from contractors' actions.

*Id*. at 481.

Applying this test, the Third Circuit held that the exception did not preempt the suit against KBR for the faulty electric work in the military barracks in Iraq. *Id*. The first prong was satisfied because "maintaining the electrical systems for a barracks in an active war zone is analogous to supplying ammunition to fighting vessels in a combat area and is certainly 'necessary to and in direct connection' to the hostilities engaged in by the troops living in those barracks." *Id*. (quoting *Johnson*, 170 F.2d at 770). But the second prong was not satisfied because the

military did not retain command authority because the contract was "performance-based" and thus did not prescribe how KBR was to do its work. *Id.*

By contrast, the D.C. Circuit held that the claim in that case—a tort suit against private interpreters and interrogators employed at Abu Ghraib in Iraq—was preempted, as the private contractors were integrated with military personnel, and "the military retained control over the tactical and strategic parameters of the mission." *Saleh*, 580 F.3d at 2, 9.

The Fifth Circuit has not yet weighed in on the scope of the combatant-activities exception, but four judges recently wrote a separate opinion on the subject. *See McManaway*, 554 Fed. App'x. at 352-54 (Jones, J., dissenting to denial of reh'g en banc). These judges indicated their agreement with the two-prong test adopted by the D.C. and Third Circuits. *See id.* at 353-54. They also would have held that the facts of the case—a tort suit by soldiers against KBR for chemical exposure while protecting KBR employees working to restore operations at an Iraqi oil facility—met the test and should be preempted. *Id.* at 354. Because the facility was subjected to looting and sabotage, and because on some occasions work was halted because of security concerns, the plaintiffs' injuries were "'necessary to and in direct connection with actual hostilities' in Iraq." *Id.* (quoting *Johnson*, 170 F.2d at 770). The contractors' "mission was fully intertwined with that of the military," and "the tasks were joint." *Id.* Preemption furthered the exception's purpose because:

31

> [e]ven a pinched reading of the combatant activities exception should shield KBR and, indirectly, the United States from jurors' state law-based second-guessing. The United States ultimately pays the judgment, if not by indemnifying KBR, then by having to pay ever-higher costs for private contractors who must be hired to fill vital gaps in military actions.

*Id.*

Freeman continues to focus on her allegations of negligent training and conduct, emphasizing that these are (1) not the Army's fault, and (2) not the result of military decision-making. Appellant's Br. at 32-34. She also contends that the incident violated the Army's own rules. *Id.* at 32-33. These arguments are beside the point, as they do not address the tests adopted by any of the circuit courts that have grappled with the question.

This Court should adopt the test utilized by the D.C. and Third Circuits because it is consistent with the broad "arising out of" language in §2680(j). *See Harris*, 724 F.3d at 480. Freeman's claim satisfies the test. First, like supplying ammunition, repairing oil-production facilities, and maintaining electrical systems in a barracks, AMK9's explosives and narcotics detection services were "necessary to and in direct connection with actual hostilities" in Afghanistan. *McManaway*, 554 Fed. App'x. at 354 (Jones, J., dissenting to denial of reh'g en banc); *Harris*, 724 F.3d at 481; *Johnson*, 170 F.2d at 770. Second, AMK9's work was fully integrated with the military. *See* 2 CR 1288 (¶4.1.5) (listing joint operations with "Government or Coalition forces," such as "circulation control and cordon support within base

32

perimeter," "static and mobile vehicle checkpoints," and "perimeter security."). Third, the military retained command authority. Although AMK9 was given discretion in training the dogs and caring for them, and although AMK9 was "responsible for management of CWD teams," 2 CR 1285 (¶1.1), the operations were joint, and the military retained overall operational command. 1 CR 266 (¶7). For example, canine detection teams deployed to the base perimeter "will be used in a patrol or detection capacity to compliment [*sic*] the security in-depth posture of the installation at the Battlefield Commander's discretion." 2 CR 1285 (¶1.1). In short, "the military retained control over the tactical and strategic parameters of the mission." *Saleh*, 580 F.3d at 2, 9. These facts are analogous to those of *McManaway* and *Saleh*. Therefore, Freeman's suit is preempted.

## C. Because AMK9 was exercising discretion in performing a governmental function, it is entitled to absolute official immunity.

Official immunity promotes effective government administration by ensuring that officials are "free to exercise their duties unembarrassed by the fear of damage suits." *Barr v. Matteo*, 360 U.S. 564, 571 (1959) (plurality opinion). Its purpose is not "to protect an erring official, but to insulate the decisionmaking process from the harassment of prospective litigation." *Westfall v. Erwin*, 484 U.S. 292, 295 (1988). The doctrine rests on the premise that the threat of damage suits might "appreciably inhibit the fearless, vigorous, and effective administration of policies of government." *Barr*, 360 U.S. at 571. Moreover, government is more effective and

33

efficient "if officials are freed of the costs of vexatious and often frivolous damages suits." *Westfall*, 484 U.S. at 295.

In *Westfall*, the U.S. Supreme Court recognized absolute official immunity from state-law tort suits for federal officials who were exercising discretion while acting within the scope of their official duties, so long as the public benefits derived from the grant of immunity outweigh the costs. *Westfall*, 484 U.S. 292, 295-98 & n.3 (1988). Although *Westfall* was superseded by the Federal Employees Liability Reform and Tort Compensation Act, *see* 28 U.S.C. §2679(d), the common-law "*Westfall* test remains the framework for determining when *non*-governmental persons or entities are entitled to the same immunity." *Murray v. Northrop Grumman Info. Tech., Inc.*, 444 F.3d 169, 174 (2d Cir. 2006); *accord Houston Cmty. Hosp. v. Blue Cross & Blue Shield of Tex., Inc.*, 481 F.3d 265, 269 (5th Cir. 2007); *see also Beebe v. Wash. Metro. Area Transit Auth.*, 129 F.3d 1283, 1289 (D.C. Cir. 1997).

*Westfall* immunity is absolute and applies to nongovernmental persons or entities performing "quintessential government function[s]". *Murray*, 444 F.3d at 175. A nongovernmental entity is entitled to official immunity from state tort liability for discretionary acts that fall within the scope of that entity's duty. *Id*. at 174. AMK9 did not include *Westfall* immunity as a ground for its plea to the jurisdiction, but immunity from suit may be raised for the first time on appeal. *San*

*Antonio Water Sys. v. Nicholas*, __S.W.3d __, 2015 WL 1873217, at *3 (Tex. Apr. 24, 2015).

The Second Circuit held that *Westfall* immunity applied to a government contractor serving as program administrator for the Irish Peace Process Cultural and Training Program, which brought young Irish people to the U.S. to "develop job skills and conflict resolution abilities." *Murray*, 444 F.3d at 172. The State Department and the Immigration and Naturalization Service ("INS") had delegated day-to-day operations to the contractor, including monitoring the youths' employment status. *Id*. After the contractor informed the State Department and the INS of accusations from an employer that two of the Irish youths might be involved in terrorism, the youths sued the contractor. *Id*. at 173.

The Second Circuit held that the contractor's actions "easily satisfy the *Westfall* test." *Id*. at 175. Monitoring the youths' employment status while in the U.S. was a quintessentially governmental function and within the course and scope of contractor's duties. *Id*. And its action was discretionary. *Id*. The government did not prescribe the contractor's actions when faced with allegations that program participants may be national-security threats. *Id*. The contractor's employees "were left to determine the appropriate course of action." *Id*. Finally, with regard to the benefits and detriments of granting immunity, the court held "[t]he balance here tips strongly in favor of immunity," as forwarding the information "is precisely the type

of discretionary action that sound public policy requires to be protected by official immunity." *Id*. Concluding that contractors should be encouraged to convey such information to the government, the court held that applying immunity furthered the purpose of the *Westfall* doctrine. *Id*. at 176.

Similarly, a federal district court in New York held that *Westfall* immunity applied to a private contractor that provided detention officers to the federal government to assist with "monitoring, transporting, and controlling persons detained for being illegally in the United States." *Viehdeffer v. Tryon*, 2012 WL 3746372, at *12 (W.D.N.Y. Aug. 28, 2012) (unpublished). In *Viehdeffer*, a detention officer sued her former employer, the contractor, for falsely reporting to the government that she had been arrested. *Id*. at *1. She was fired, at the government's request, because of the report. *Id*.

Applying the *Westfall* test, the court concluded that criminal detention is "an exclusively governmental function." *Id*. at *12. Further, the contractor's action was within the scope of its contract because the contract obligated the contractor to provide qualified detention officers and to "report to ICE any conduct that might be characterized as 'immoral' or as constituting 'any other criminal offense.'" *Id*. The contractor's report was discretionary because it had to "determine what information . . . was sufficiently immoral or criminal to warrant it being transmitted to ICE." *Id*. And, public policy favored immunity's application because deterring

36

companies from sharing information with the government could "negatively affect[] that agency's ability to ensure the safe and secure administration of detention centers." *Id*.

This case is analogous to *Murray* and *Viehdeffer*. AMK9 is performing a quintessentially governmental function by providing the U.S. Army with contract working dog teams to detect IEDs in a combat zone. AMK9's canine teams supplement the Army's own military working dog teams "to execute force protection requirements in support of combat operations." 2 CR 1285 (¶ 1.1). AMK9's role is analogous to that of the *Viehdeffer* contractor in providing detention officers.

Also, the conduct at issue here was within the course and scope of AMK9's contractual duties, as AMK9 and its employees were responsible for caring for and supervising Kallie. *See* 2 CR 1292-93. Likewise, the AMK9 actions that Freeman alleges led to her injuries—the failure to control canine Kallie and properly train both her and her handler, 1 CR 5-9—were discretionary. The contract establishes certification requirements for canine teams, 2 CR 1303-07, and requires training, 2 CR 1288 (¶4.1.4), but it prescribes neither training techniques nor specific actions handlers must take to control dogs.[7] Rather, the contract establishes performance goals, 2 CR 1288 ¶4.1.4 ("Contractor is required to conduct additional training and

---

[7] The contract prescribes the content of training in only one area: explosives safety training for handlers. 2 CR 1289 ¶4.2.1.

maintain [patrol explosive detector dog] detection proficiency at 95 percent or better on explosive compounds in common usage by enemy forces in Afghanistan."), leaving to AMK9's discretion how to achieve them. This discretion is analogous to that provided in *Murray* and *Viehdeffer*.

Finally, the benefits of granting immunity to AMK9 in this circumstance outweigh the detriments. Freeman would not be able to recover from AMK9 for her alleged injuries, but she is not without a remedy. Under the Defense Base Act, defense contractors providing services to the Armed Forces overseas (such as Freeman's employer, Honeywell) must carry workers' compensation coverage. *See* 42 U.S.C. §§1651-54; *Jones v. Halliburton*, 791 F.Supp.2d 567, 582 (S.D. Tex. 2011). Indeed, Freeman may already be in the process of receiving DBA benefits.

On the other hand, significant harm could occur if immunity is not afforded here. The decisionmaking process about proper training for dogs and handlers must be protected. Just as a court should be loathe to second-guess training for the military *per se*, it should also be reluctant to sit in judgment on the equivalent for a government contractor, especially when contract teams are replacing military teams, are integrated in military operations, and are performing quintessential military functions under the overall command of military authorities. *See* 2 CR 1288 (requiring AMK9 to maintain 95% success rate in detection performed in joint operations with Government and Coalition forces). Otherwise, readiness for IED

detection—a crucial military function—would be compromised. Just as in *Viehdeffer*, the threat of suits like Freeman's could lead contractors like AMK9 to train their dogs to be more docile and hesitant, which would decrease effectiveness for detection dogs working in a dangerous and hostile combat zone. It could also discourage private contractors from providing crucial services to the military.

The *Westfall* test is satisfied. AMK9 is entitled to absolute official immunity from Freeman's claims.

### D.     AMK9 is immune under the Defense Production Act of 1950.

AMK9's contract with the Defense Department is a "rated order" contract with assigned priority rating "DO-C9." 1 CR 265-66. As a contractor under a rated-order contract, AMK9 is immune under the Defense Production Act of 1950. *See* 50 U.S.C. Appendix §2061 *et. seq.* Rated order contracts are deemed by the President of the United States to be "necessary or appropriate to promote the national defense." *See* 50 U.S.C. §2071(a)(1). The Act contains a broad immunity provision:

> No person shall be held liable for damages or penalties for any act or failure to act resulting directly or indirectly from compliance with a rule, regulation, or order issued pursuant to this Act . . . .

50 U.S.C. Appendix §2157. "Order" means an order of goods or services (such as "placing" and order), not a command or decree. *See* 50 U.S.C. §2071(a) (discussing "performance under contracts or orders (other than contracts of employment)"); *see* 1 CR 267 (describing Defense Department priorities for rated-order contracts as

compared to unrated-order contracts). The United States Supreme Court has held that this provision "plainly provides immunity." *Hercules Inc. v. United States*, 516 U.S. 417, 429 (1996).

The Act provides broad protection to government contractors in their performance of defense-related contracts, a point that Freeman does not dispute. She argues that the scope of the protection extends only to contract actions by customers of the contractor whose orders were delayed or denied by the contractor's fulfillment of the government's needs. Under Freeman's interpretation, therefore, the Act would not provide immunity from tort suits such as this one.

Freeman relies solely on an Eighth Circuit decision that, in turn, relies on the Federal Circuit decision that the Supreme Court reviewed in *Hercules*. *See* Appellant's Br. at 40-41 (citing *United States v. Vertac Chem. Corp.*, 46 F.3d 803, 812 (8th Cir. 1995) (citing *Hercules, Inc. v. United States*, 24 F.3d 188, 203-04 (Fed. Cir. 1994), *aff'd on other grounds*, *Hercules*, 516 U.S. at 429)). The Supreme Court affirmed the judgment but explicitly declined to decide the scope of the Act's immunity. *Hercules*, 516 U.S. at 430 n.14. AMK9 is aware of no other decisions that settle this question.

Courts are guided principally by a statute's text. The statute's plain language is broad, conferring immunity for "any act or failure to act." 50 U.S.C. Appendix §2157. If Congress had intended to limit the scope to contract actions by the

40

contractor's competing customers, it could have said so. *See United States v. Bradshaw*, 840 F.2d 871, 875 (11th Cir. 1988). The statute simply cannot be read as Freeman suggests.

Freeman also argues that the Act's immunity is not jurisdictional, relying on a Fifth Circuit decision holding that the Act's immunity is not appealable in federal court under the collateral-order doctrine. Appellant's Br. at 39-40 (citing *Martin v. Halliburton*, 618 F.3d 476, 485-86 (5th Cir. 2010)). However, the federal collateral-order doctrine is not always co-extensive with analysis of subject-matter jurisdiction in Texas courts. Compare *Brown & Gay v. Olivares*, 2015 WL 1897646, at *5 n.8 (Tex. Apr. 24, 2015) (disposing of an issue of derivative sovereign immunity in context of plea to the jurisdiction), with *Ackerson v. Bean Dredging LLC*, 589 F.3d 196, 207 (5th Cir. 2009) (holding that derivative sovereign immunity under *Yearsley v. W.A. Ross Constr. Co.*, 309 U.S. 18 (1940), does not deprive district court of jurisdiction).

As the purpose of the Defense Production Act is to allow contractors to concentrate all their resources on providing goods and services to the government for purposes of national defense, it should be construed as jurisdictional to spare contractors the burdens of defending suits that will only prove fruitless, as contractors cannot be liable. Such a construction would also spare the military itself from intrusive and time-consuming discovery. For example, if this suit proceeds,

41

the parties will need to obtain substantial discovery from the Defense Department, including the depositions of multiple officers from Camp Mike Spann. The Defense Production Act was intended to prevent this sort of disruption of military activities.

## II. The trial court correctly denied Freeman's request to replead.

Even if the plea was correctly granted, Freeman asserts that the trial court erred in dismissing her claim because she is entitled to an opportunity to amend her pleadings to bring her claim within the trial court's jurisdiction. Appellant's Br. at 41-43. Courts should afford a plaintiff the opportunity to replead "[i]f the pleadings do not contain sufficient facts to affirmatively demonstrate the trial court's jurisdiction." *Tex. Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 226-27 (Tex. 2004). But "[i]f the pleadings affirmatively negate the existence of jurisdiction, then a plea to the jurisdiction may be granted without allowing the plaintiffs an opportunity to amend." *Id*. at 227.

The trial court correctly dismissed, as Freeman cannot show the defect is curable. Indeed, she did not append a proposed revised pleading to her motion for leave to amend, and in the motion she never once articulates *how* she would replead to bring her claims within the trial court's jurisdiction. The contours of Freeman's claim and AMK9's defenses are clear. This is not a case in which pleading additional facts would change the jurisdictional analysis. Additional facts will not alter:

- The need for the factfinder to weigh the Army's fault (a political question) against AMK9's and HCDC's fault as part of its proportionate-responsibility analysis;

- The integration of AMK9 with the military on the battlefield in Afghanistan (establishing preemption under combatant activities exception of FTCA);

- AMK9's contractual discretion in training dogs and handlers in the performance of its governmental function (establishing *Westfall* immunity)

- The fact that the contract is a "rated order" contract (establishing immunity under the Defense Production Act of 1950).

Indeed, the Conclusion to Freeman's motion to amend makes clear that the pleading defect is legal, and therefore incurable: "[I]t is possible to amend Freeman's Original Petition to emphasize and clarify that the only matter at issue in this lawsuit is AMK9's failure to properly attend to the CWD's training, handling, and behavior—which even AMK9 concedes is solely its responsibility." 2 CR 1400. As AMK9 has demonstrated, Freeman cannot plead around the proportionate-responsibility statute. The trial court properly denied Freeman's request to replead and dismissed the case.

**III. The trial court's grant of AMK9's responsible-third-party designation was correct.**

Freeman also challenges the trial court's grant of AMK9's designation of the Army as a responsible third party regarding Freeman's injuries. Chapter 33 provides:

> the court shall grant leave to designate the person as a responsible third party unless the objecting party establishes: (1) the defendant did not plead sufficient facts concerning the alleged responsibility of the person to satisfy the pleading requirement of the Texas Rules of Civil Procedure . . .

TEX. CIV. PRAC. & REM. CODE §33.004(g)(1). Freeman did not make the showing §33.004(g)(1) requires. *See* 1 CR 590. Nor could she have done so, because AMK9 pleaded sufficient facts to establish all elements of a negligence claim against the Army: duty, negligence, and proximate cause. *See* 1 CR 221 (first amended answer), 436-38 (RTP designation). Moreover, the record contains *evidence* of those facts. 1 CR 266, 398, 401. Thus, the trial court correctly granted the RTP designation.

## CONCLUSION AND PRAYER

Appellee American K-9 Detection Services, LLC respectfully requests that the Court affirm the trial court's grant of the plea to the jurisdiction and its dismissal of the case.

Respectfully submitted,

/s/ Wallace B. Jefferson
Wallace B. Jefferson
State Bar No. 00000019
wjefferson@adjtlaw.com
Rachel A. Ekery
State Bar No. 00787424
rekery@adjtlaw.com
Amy Warr
State Bar No. 00795708
awarr@adjtlaw.com
Alexander Dubose Jefferson &
Townsend LLP
515 Congress Avenue, Suite 2350
Austin, Texas 78701-3562
Telephone: (512) 482-9300
Facsimile: (512) 482-9303

James M. Parker
State Bar No. 15488710
jparker@namanhowell.com
NAMAN, HOWELL, SMITH & LEE
10001 Reunion Place, Suite 600
San Antonio, Texas 78216
Telephone: (210) 731-6364
Facsimile:  (210) 785-2964

***Counsel for Appellee American K-9
Detection Services, LLC***

45

**CERTIFICATE OF SERVICE**

On June 4, 2015, I electronically filed this Brief of Appellee with the Clerk of the Court using the eFile.TXCourts.gov electronic filing system which will send notification of such filing to the following.

Frank Herrera, Jr.
State Bar No. 09531000
fherrera@herreralaw.com
Javier Herrera
State Bar No. 24075498
javier@herreralaw.com
THE HERRERA LAW FIRM, INC.
111 Soledad Street, #1900
San Antonio, Texas 78205
Telephone: (210) 224-1054
Facsimile: (210) 228-0887

Beth Watkins
State Bar No. 24037675
beth.watkins@watkinsappeals.com
Shannon K. Dunn
State Bar No. 24074162
shannon.dunn@watkinsappeals.com
LAW OFFICE OF BETH WATKINS
926 Chulie Drive
San Antonio, Texas 78216
Telephone: (210) 225-6666
Facsimile: (210) 225-2300

*Attorneys for Appellant*
*LaTasha Freeman*

Albert D. "Pat" Pattillo, III.
State Bar No. 15623350
pat@prhlaw.com
PATTILLO RICHARDS & HARPOLD, P.C.
280 Thompson Drive, Suite B
Kerrville, Texas 78028
Telephone: (830) 257-8080
Facsimile: (830) 896-8489

*Attorneys for Appellee*
*Hill Country Dog Center, LLC*

/s/ Wallace B. Jefferson
Wallace B. Jefferson

46

**CERTIFICATE OF COMPLIANCE**

Based on a word count run in Microsoft Word 2013, this brief contains 10,196 words, excluding the portions of the brief exempt from the word count under Texas Rule of Appellate Procedure 9.4(i)(1).

/s/ Wallace B. Jefferson
Wallace B. Jefferson

# INDEX

1.  Trial Court's Order granting plea to the jurisdiction (7-28-14)

2.  Performance Work Statement

3.  Freeman email and handwritten statement (11-16-11)

4.  Freeman Affidavit

5.  Dorough email and Freeman response (11-16-11)

6.  AMK-9 Incident Report (9-11-11)

7.  Affidavit of Willard Chipman (5-29-15)

8.  Defense Priorities and Allocation System (DPAS)

**APPENDIX 1**

**CAUSE NO. CV-13-246**

| | | |
|---|---|---|
| LATASHA FREEMAN | § | IN THE DISTRICT COURT |
| | § | |
| | § | |
| VS. | § | 198TH JUDICIAL DISTRICT |
| | § | |
| AMERICAN K-9 DETECTION | § | |
| SERVICES, L.L.C. and HILL | § | |
| COUNTRY DOG CENTER, L.L.C. | § | BANDERA COUNTY, TEXAS |

## ORDER GRANTING PLEA TO THE JURISDICTION

On the **2nd** day of **July, 2014**, the Court considered DEFENDANT, AMERICAN K-9 DETECTION SERVICES, LLC'S PLEA TO THE JURISDICTION, and after reviewing the materials filed with the Court and hearing the arguments, the Court finds that the Plea to the Jurisdiction should be **GRANTED**.

**IT IS THEREFORE ORDERED** that Defendant, American K-9 Detection Services, LLC's Plea to the Jurisdiction is hereby **GRANTED IN ALL THINGS,** and American K-9 Detection Services, L.L.C. **and** Hill Country Dog Center, L.L.C. are both hereby dismissed as parties to this case.

**SIGNED** on _28_ day of _____July_____ , 2014.

_____
PRESIDING JUDGE

JAVIER HERRERA: Facsimile: (210) 228-0887
PLAINTIFF'S ATTORNEY

PAT PATILLO: Facsimile: (830) 896-8489
ATTORNEYS FOR HILL COUNTRY DOG CENTER, LLC

JAMES M. PARKER, JR.: Facsimile: (210) 785-2964
ATTORNEYS FOR AMERICAN K-9 DETECTION SERVICES, LLC

FILED

2014 JUL 29 PM 1:26

TAMMY KNEUPER, DIST. CLERK
BANDERA COUNTY, TEXAS
BY: _____
DEPUTY

Amos Barton   257-7580

612

# APPENDIX 2

**PERFORMANCE WORK STATEMENT**
**CONTRACT WORKING DOG (CWD) SERVICES**
**SELECTED PROVISIONS**



**COMMUNICATIONS AND RELATIONSHIP WITH AMK9'S CLIENT.** Although frequent reference is made in this subcontract to the Prime Contract and portions of the Performance Work Statement are included hereto, the Prime Contract is not incorporated in, nor is it a part of, this subcontract. Nothing contained herein shall be construed as to create or imply any direct contractual relationship between the Subcontractor and the Government.

**1. DESCRIPTION OF SERVICES:**

1.1.     SCOPE OF WORK. Combined Joint Operations Area – Afghanistan (CJOA-A), US Forces Afghanistan (USFOR-A), requires Contract Working Dog (CWD) services in lieu of Military Working Dogs (MWD) to execute force protection requirements in support of combat operations. CWD support includes providing certified Patrol Narcotics Detector Dogs (PNDD), Patrol Explosives Detector Dogs (PEDD), trained certified handlers, and administrative support staff (Kennel Masters and trainers) to conduct operations in the CJOA-A. The contractor will plan and execute the fielding of CWD teams to contract hubs at Kandahar AB and/or Bagram AB, Afghanistan, the central points for distribution to various locations throughout the CJOA-A. PNDD and PEDD teams will work at installation Entry Control Points (ECP), Large Vehicle Search Areas, Vehicle Control Points (VCP) and other locations as necessary inside the installation perimeter boundary and out to the limits of the base exclusion zone. NOTE: The base exclusion zone is limited to 400 meters outside of the perimeter fence and is considered part of the perimeter. CWDs used in the base exclusion zone will be used in a patrol or detection capacity to compliment the security in-depth posture of the installation at the Battlefield Commander's discretion. If CWDs are utilized in the base exclusion zone, the government will provide an armed security escort. Geographically separate screening sites (GS3s) to include entry control points, vehicle soak yards, personal baggage screening areas, and vehicle search areas that have proper force protection measures in-place IAW GTA 90-01-011 (Joint Forward Operations Base (JFOB) Survivability and Protective Construction Handbook) are considered part of the FOB and are approved for CWD utilization. Movement to and from these areas requires a USG provided armed security escort. The contractor is responsible for management of CWD teams to achieve mission accomplishment. The contractor will interface with Force Protection Officers, NATO Forces, Provost Marshals, Unit Headquarters, Commanders, USFOR-A Working Dog Program Manager (PM), and Soldiers, Sailors, Airmen, and Marines.

1.2     DOG STANDARDS. PEDDs and PNDDs under this contract shall not be younger than one (1) year and not older than seven (7) years of age. Contract dogs will be of a breed that meets this standard or work, capable to fulfill all search requirements as outlined appendix C of this statement of work. Type breeds will be reviewed and approved by the COR/Working Dog Program Manager during contract vetting.

**2. MOBILIZATION AND DEPLOYMENT**

2.1     DEPLOYMENT PREPARATION. The contractor will plan and execute initial deployment to Kandahar Air Base or Bagram Air Base, Afghanistan. The contractor shall provide program management oversight of contractor's US personnel and dogs to the designated CONUS Replacement Center (CRC), Ft. Benning, GA. All contract personnel will process through the CRC. Contractor personnel who have previously been certified by a USFOR-A approved certification authority, processed CRC, and are currently working in the CJOA-A, do not have to process CRC again as long as they meet all USFOR-A standards for proficiency and possess a current and valid certification.

2.2     All dogs shall have a valid physical examination within 10 days of deployment from the CRC. Dogs will be evaluated to be reasonably sure that the dog will be able to complete its assignment to Afghanistan with minimal

AMK9-0064

medical difficulty. During the course of CRC training, the contractor is responsible for off-post kenneling. CWDs will not be provided kennel or life support by U.S. Army Military Kennel Master. CWD's that have expired health certificates will be required to renew their health certificate before deployment at the contractors' expense.

2.3     The following actions shall be accomplished prior to shipment overseas: Initial certifications will be made in CONUS at the CONUS Redeployment Centers (CRCs) or other pre-designated locations prior to deployment to the Afghan AOR and at the contractor's expense. Upon successful completion of certification by the Working Dog Program Manager or designated certification authority, a Government provided or approved veterinarian will embed a microchip and attach the corresponding Universal Product Code (UPC) sticker to the CWD's medical records. The microchip will be used for accountability and tracking purposes. Any tampering with microchips or UPC stickers will be considered a breach of contract and will result in immediate removal of CWD and handler from the CJOA-A. Vaccination against rabies, canine distemper, canine adenovirus type 1 or type 2, leptospirosis, canine parvovirus, and par influenza (if dog has not been vaccinated for these diseases within the past 6 months) will be performed by a Government provided or approved veterinarian. CWDs require Fluorescent Antibody Viral Neutralization (FAVN) test showing results of >0.5 U/ml prior to deployment. The Government provided or approved veterinarian will record the CWD's microchip number to properly identify the dog's blood sample. Results of all examinations and vaccinations will be recorded in CWD medical records. A Government provided or approved veterinarian shall ensure immunizations are current and consistent with the requirements of destination (local, state, and national) regulations. Other vaccinations and treatments, to include teeth cleaning, shall be administered at the discretion of the veterinarian. Treatment to eliminate external and internal parasites prior to shipment shall be performed. All treatments / vaccinations / tests, and certifications will be done at the contractor's expense. All CWDs will receive updated vaccinations within 30 days of deployment to ensure appropriate coverage during the full period of deployment.

2.4     All dogs shall be accompanied by health certificates, Rabies vaccination certificates, and FAVN test, prepared and signed by a licensed Government provided or approved veterinarian no more than 10 days prior to embarkation or movement from CRC. The handler shall hand carry the complete medical record to the AOR. The Government shall use the DD form 1741 to record the results of the above test and vaccinations.

2.5     Only dogs under 7 years of age and in excellent health will be shipped overseas. Dogs with disease conditions that might adversely affect performance or require extensive veterinary care shall not be shipped. CWDs certified as CAT I (no medical/physical issues) as outlined in AR 700-81, Paragraph 1.17 prior to deployment. No CWD will be deployed below a CAT I.

2.6     The contractor shall provide all necessary equipment and supplies needed to safely transport the dog to their final destination within the Afghan theater of operation, to include Kandahar or Bagram Air Bases as the main distribution hubs.

2.7     Each dog shall deploy with a dog crate acceptable to transportation carrier(s). Crates must be durable as they may be required to be used as temporary kennels at FOBs and/or PRTs once deployed to Afghanistan.

2.8     Each dog / handler team shall deploy with the appropriate equipment and supplies in order to be fully operational, once validated by USFOR-A Working Dog PM or his designated representative for deployment to operational areas in the AOR.

2.9     Contractor shall develop a management plan that explains how they will meet an aggressive delivery schedule. CWD teams, kennel masters, and trainers will need to be deployed to theater IAW the government's incremental phase-in plan to be provided after contract award. Due to CRC class size limitations and the requirement for CWD teams to complete certification prior to CRC attendance, in most cases this will mean deployment increments between 5-10, 10-15, or 15-20 teams at a time. NOTE: This number may include a mix of CWD teams, kennel masters, and trainers (personnel). The Contractor will not be required to deploy the entire number

AMK9-0065

of CWD teams to theater in mass and the phase-in period will occur over a period of several weeks or months depending on the size of the Regional Command (RC) supported. The Contractor's Plan will be submitted 30 days prior to deployment to Rock Island Contracting Center (RICC), COR, and USAFOR-A Working Dog Program Manager. Plan will be reviewed and maintained by the Government. Contractor shall be prepared to brief Government as requested.

## 3. SCHEDULING AND EMPLOYMENT

3.1 The Contractor's Kennel Master shall assist the Contracting Officer Representative (COR), the U.S. National Command Element (NCE) Force Protection Officer, in developing duty schedules, duty cycles, duty hours, and methods of using CWD teams that best support operations, based off of a 50-hour work week. This schedule does not include hours necessary for the training and maintenance requirements as detailed in 1.3.2 and 1.3.3 below. The Contractor's Kennel Master shall be prepared, as directed, to assist the Provost Marshal, ISAF Force Protection Officer, NCE, BASEOPS, Force Protection Commander, or Operations Officer in developing plans and duty schedules to best support operations. Scheduling will include mandatory proficiency training, health and welfare of the CWDs, kennel and equipment maintenance.

3.2 The contractor's duty schedule shall allow at least eight hours each week for proficiency training (4 hours for patrol and 4 hour for detection training), which shall be in addition to the normal duty schedule based on a 50-hour work week. Training will be validated by the COR/USFOR-A Working Dog PM or designated representative, on a monthly basis or as requested by the Government.

3.3 Daily work schedules shall provide adequate time for feeding, grooming, and exercising the dogs, and for maintenance of equipment and kennel facilities (this should not exceed one to two hours per day), which shall be in addition to the normal duty schedule based on a 50-hour work week. The kennel master will be responsible for ensuring kennel sanitation and maintenance, CWD feeding, grooming, and exercising is conducted daily as outlined in this performance work statement.

3.4 Contract Dog Teams will consist of one handler/one CWD. Both handler and CWD will be certified as an operational team by the USFOR-A Working Dog Program Manager or designated certification authority. The contractor is responsible for providing sufficient handlers/CWDs to ensure that there is no loss in service due to illness, death, leave, etc.

3.5 Change in handlers will be documented and approved by the Contracting Officer or COR in writing before the change can take place. The contractor must provide a written request of handler changes to the Contracting Officer/ USFOR-A Working Dog PM as determined. Change in handlers will not reduce the number of operational teams (PNDD, PEDD) within the USFOR-A, AOR. Changes in dogs or handlers will require team recertification in theater.

3.6 Unassigned dogs are the responsibility of the Kennel Master/trainer. It is their responsibility to care for, groom and conduct proficiency training for each unassigned dog in keeping with the same exact standards and schedule as each assigned dog until a handler is assigned. The Kennel Master/trainer may employ qualified assistants to help maintain these standards.

3.7 The contractor shall notify the Contracting Officer or COR within 3 working days of a handler termination/resignation or is placed on administrative duty/medical care at which time the Kennel Master/trainer will take responsibility for the dog until a new handler is approved by the COR (see paragraph 1.4.6.2).

## 4. TRAINING AND CERTIFICATION

AMK9-0066

4.1     PEDD Training and Certification.

4.1.1   The proficiency of Patrol Explosive Detector Dog (PEDDs) is a critical skill that depends on continual reinforcement training. To maintain satisfactory proficiency (95 percent or better detection rate with no more than a false response rate of 5 percent), PEDDs shall be given a minimum of 4 hours each for patrol and explosive detection proficiency training per week.

4.1.2   Contractor shall ensure each PEDD is given proficiency training on each of the explosive odors listed in this PWS no less than 5 times every month.

4.1.3   Within safety limits, training shall be conducted in the same or a similar environment that the PEDD team will be required to work.

4.1.4   Contractor shall conduct training so PEDDs detection rate is 95 percent or better on each of the following explosives: commercial dynamite (Gelatin and Ammonium Nitrate); military dynamite; water gel (TOVEX); TNT (trinitrotoluene); smokeless powder; C-4 plastic explosive; detonating cord; potassium chlorate; sodium chlorate at a minimum.  Contractor is required to conduct additional training and maintain PEDD detection proficiency at 95 percent or better on explosive compounds in common usage by enemy forces in Afghanistan.  Such compounds will be identified to the Contractor's Kennel Master by USFOR-A Working Dog Program Manager in concert with the  COR in writing and the Contractor will have at least 30 calendar days to attain the required detection proficiency on additional explosives.  NOTE: The U.S. Government reserves the right to change or modify types of explosives used for training base on availability of explosives and mission requirements within the Combined Joint Operations Area-Afghanistan.

4.1.5   Contractor will be prepared to maintain 95 percent or better proficiency in a mission oriented scenario. This includes but should not be limited to:  Operations with Government or Coalition forces to include circulation control and cordon support within base perimeter, Operations with Government or Coalition forces, as well as Operations with Government or Coalition forces during static and mobile vehicle checkpoints, operations with Government or coalition forces in performance of perimeter security of Forward Operating Bases or static facilities.

4.1.6   PEDD Teams shall be certified as explosive detection teams prior to being employed for explosives detection. This will be accomplished by demonstrating minimum proficiency (95 percent or better detection rate) to an USFOR-A approved Certification Authority as outlined in Appendix C.

4.1.7   Uncertified PEDD teams are prohibited from conducting proficiency training at Entry Control Points (ECP), inspection lanes, or any area where the Government is currently utilizing certified PEDD teams. PEDD may conduct training in such areas during non duty hours of operation. Uncertified PEDD teams will not work these areas as on the job training.

4.1.8   Certification of a PEDD team is immediately nullified when the dog or handler is re-assigned.

4.1.9   Initial certification will be conducted by a USFOR-A approved Certification Authority in CONUS, at a CRC or other pre-designated location, prior to deployment. Re-certifications will be accomplished in-theater by a USFOR-A approved Certification Authority. Initial certifications and re-certifications are valid for one year, and will always be conducted at the contractor's expense.

4.1.10  Teams failing initial certification will be certified only after retraining and demonstration of the minimum standard of proficiency to an appointed USFOR-A approved Certification Authority, within 30 days from initial certification failure.  The contractor is responsible to provide backfills for uncertified teams, to ensure

AMK9-0067

no gaps exist. CWD's failing annual re-certification will be decertified from the program, and will be returned to the vendor at the vendor's expense.

4.1.11 PEDDs must be in a healthy state common to a well bred, disciplined trained PEDDs shall be trained with a passive response (sit upon detection).

4.1.12 PEDD handler, during the certification process, must demonstrate knowledge of proper search, detection, and response procedures. Additionally, the handler's proficiency is evaluated by having the handler demonstrate knowledge of the following subjects through a question and answer session conducted during CWD team certification:

(1) The characteristics of each of the explosives the team is trained to detect.
(2) How these explosives may be used in explosive devices.
(3) The requirements for safe handling, transportation, and storage of these explosives.
(4) The requirements for conducting safe training exercises.
(5) Basic K-9 first aid

4.1.13 The Contractor's Kennel Master and CWD Trainer/Supervisor shall conduct quarterly validations on all PEDD Training and inform the Contacting Officer or COR in writing of each PEDD not meeting 95% standard on detecting explosive odors.

4.1.14 The COR/Working Dog Program Manager has the right to request a validation on any PEDD team who shows a decrease in detection performance, or a reason to doubt the teams' reliability.

4.1.15 Contractor is responsible for providing training aids (explosive/narcotics) to support training proficiency prior to and while deployed to the CJOA-A. Scent disks will not be used as a substitute for traditional training aids. The USG will provide storage facilities for explosive and narcotic training aids within the CJOA-A.

4.1.16 Contractor shall conduct monthly explosives and narcotics inventory with a disinterested person designated by the COR IAW AR 190-11 and AR 190-51.

4.1.17 EOD personnel will inspect all explosive training aids and their containers once a quarter or when deemed necessary by the contractor's Kennel Master.

4.1.18 Contractor shall provide a certificate of completion for all PEDD handlers of an explosive detector dog handler course to the Contracting Officer, Working Dog Program Manager.

4.2 Explosives Safety Training.

4.2.1 Contractor shall ensure that initial explosives safety training occurs before individuals participate in any explosives training. Government explosives ordnance personnel validate and assist with training and ensure safety standards are maintained. Mandatory training will include safe storage, transportation, and handling of each type of explosive to be used as training aids. A memorandum with names and signatures of each handler who attend all explosive training will be kept on file for 2 years or upon completion of this contract.

4.3 PNDD Training and Certification.

4.3.1 PNDD Teams shall be certified as a narcotics detection team before being employed for narcotics detection. The proficiency of narcotics detector dogs is a critical skill that depends on continual reinforcement training. To maintain satisfactory proficiency (90 percent or better detection rate with no more than a false response

AMK9-0068

rate of 10 percent), PNDDs shall be given a minimum of 4 hours each for patrol and narcotics detection proficiency training per week.

4.3.2 Contractor shall conduct training so that narcotics detection proficiency is at 90 percent or better on each of the following drug contraband substances: heroin, MDMA (ecstasy), marijuana, cocaine, methamphetamine, hashish. NOTE: The U.S. Government reserves the right to change or modify types of narcotics used for training base on availability of narcotics and mission requirements within the Combined Joint Operations Area-Afghanistan.

4.3.3 Failure to maintain an average proficiency that meets or exceeds the minimum proficiency standard for three or more consecutive months will result in automatic decertification of the narcotics detector dog team.

4.3.4 The team may be recertified only after retraining and consistent demonstration of the minimum standard of proficiency to an appointed USFOR-A approved Certification Authority.

4.3.5 Initial certification will be conducted by the USFOR-A approved Certification Authority in CONUS prior to deployment. Initial and re-certifications are valid for one year.

4.3.6 Certification on the following narcotic odors at 90% are the established certification criteria: heroin, MDMA (ecstasy), marijuana, cocaine, methamphetamine, hashish.

4.4 Patrol Training and Certification.

4.4.1 PEDDs and PNDDs will be dual certified in detection and patrol and shall meet the proficiency standards outlined in Appendix C. As evaluation criteria, the correct performance of the required tasks serves to verify that the handler understands control.

4.4.2 Contractor shall conduct training and maintain proficiency on the tasks outlined in Appendix C.

4.4.3 Failure to maintain proficiency that meets or exceeds the minimum proficiency standard will result in decertification as a PEDD or PNDD.

4.4.4 The team may be recertified only after retraining and consistently demonstrating the minimum standard of proficiency to an USFOR-A approved Certification Authority. Mission will be maintained by contingent teams. There will be no loss of mission performance.

4.4.5 Initial certification will be conducted by USFOR-A approved Certification Authority in CONUS prior to deployment. Initial and re-certifications are valid for one year.

4.5 Contingent Teams.

4.5.1 Contractor shall have sufficient contingent teams ready to replace any working team due to death, injury, vacation, decertification, or for any other reason that would cause a working team to not be able to perform under the terms of this contract.

4.5.2 Contingent teams shall meet the same standards as teams that are working.

AMK9-0069

4.6     Re-certification

   4.6.1   Re-certification is an annual requirement for all CWD teams.

   4.6.2   All re-certifications will follow the same procedures as the initial certification. Contractor shall coordinate with the USFOR-A Working Dog PM who will in-turn contact the designated Certification Authority to make arrangements to recertify team(s) prior to the expiration of the current certification. Annual recertifications will be performed in-theater. In the event that a team requires certification outside of annual recertification timelines (i.e. handler assigned to a new dog), prior coordination and approval will need to be made with the USFOR-A Working Dog PM. These circumstances should be rare and the exception to the rule. NOTE: The U.S. Government reserves the right to reject any dog or handler that does not meet minimum standards specified herein.

## 5.  KENNEL OPERATIONS

5.1     Sanitation.

   5.1.1   The Kennel Master (KM) shall enforce sanitary measures in and around the kennel area. Sanitation/cleanliness will be maintained and the kennels will be inspected on a daily basis to prevent disease and injury. Each handler is responsible for the sanitation of their respective assigned run. KM is responsible for overall cleanliness. COR/Working Dog PM will conduct frequent health and welfare inspections to ensure standards are maintained. Contractor will allow unrestricted access to military veterinarians to perform periodic health and welfare inspections of the dogs and kennel facilities using DD Form 2342. Inspections will focus on the prevention and control of communicable diseases, diseases that can be passed from one animal to another, as well as zoonotic diseases, diseases passed from animal to human.

   5.1.2   Food preparation area shall be kept as clean as possible. Dogs may get diseases from food prepared with dirty hands or dirty utensils. To prevent disease, the contractor shall clean and sanitize the food and water utensils daily.

   5.1.3   Kennels must be sanitary, in a good state of repair, and thoroughly cleaned every day. Kennels shall be disinfected daily using only those disinfecting products approved by the veterinarian.

5.2     Grooming.

   5.2.1   Grooming and inspection are essential to the dog's health and well-being, and shall be done daily by the Contract handler. Any deficiencies in the health or physical condition of the CWD will be reported to the Contract KM immediately. KM/Supervisor is responsible for mitigating immediate corrective measures for the CWD. Handlers will maintain records of daily inspections.

5.3     Feeding.

   5.3.1   The contractor shall be responsible for providing and feeding their dogs food that is the same or similar to, Hills Science Diet Active, (NSN: 8710-01-415-6950). Any modifications to the directed diet must be approved by a Military Veterinarian.

   5.3.2   Contractor shall be responsible for providing food for the CWDs during the period of performance.

AMK9-0070

5.4    Maltreatment.

5.4.1    Maltreatment of any form will not be tolerated. Any allegations of maltreatment as reported or documented by the military veterinarian will be reported to the Contracting Officer and USFOR-A Provost Marshal's Office (PMO) immediately. Personnel accused of maltreatment may be prosecuted under the Animal Welfare Act located in the United States Code (USC), Title 7, Sections 2131 to 2156.

## 6. SERVICE SUMMARY:

| Performance Objective | PWS Section | Performance Threshold |
|---|---|---|
| Effectively Plan, Implement, and Manage deployment of qualified handlers and qualified dogs. | 1.2.1<br>1.2.1.2<br>1.2.1.3<br>1.2.1.4<br>1.2.2<br>1.3.1<br>1.3.2<br>1.3.3<br>1.3.4<br>1.4.1.7<br>1.4.1.8 | 100% Of The Time |
| Provide medically qualified dogs. (CAT I) | 1.2.1.2<br>1.2.1.3<br>1.2.1.4<br>1.2.1.5 | 100% Of The Time |
| Provide adequate equipment and supplies for deployment. | 1.2.1.6<br>1.2.1.6.1<br>1.2.1.6.2 | 100% Of The Time |
| Develop schedules, duty cycles, and duty hours. | 1.3 | 95% Of The Time |
| Provide adequate proficiency training time. | 1.4.1<br>1.4.3<br>1.4.4 | 100% Of The Time |
| Ensure dog and handler certification. | 1.4.1<br>1.4.3<br>1.4.4<br>1.4.6 | 100% Of The Time |
| Ensure proper explosives safety training. | 1.4.2 | 100% Of The Time |

AMK9-0071

| | | |
|---|---|---|
| Ensure patrol narcotics detector dog and handler certification. | 1.4.3 | 100% Of The Time |
| Ensure kennel maintained properly. | 1.5.1 | 100% Of The Time |
| Ensure proper care of dogs. | 1.5.2 1.5.3 | 100% Of The Time |
| Required Reports | Appendix A | Submit Required Reports On Time 95% Of The Time |

## 7. GOVERNMENT-FURNISHED PROPERTY and SERVICES

### 7.1     Facilities

7.1.1     Dog Kennel. Contractors will be provided kennel facilities at each of the respective locations in Afghanistan as conditions allow. Kennel facilities may be austere at distant Forward Operating Bases (FOBs). Temporary kennels/shipping crates may be utilized as the primary means of kenneling as conditions dictate. Three existing kennels have been established at Kandahar Air Base, Afghanistan. These kennels are 5,210 Square Feet, and are Government owned. Government kennels at Kandahar Air Base are designated to house 15 canines. Kennel facilities are currently being planned for Bagram AB. Exact square footage is to be determined. Designation of contract kennels is the sole responsibility of the site MWD Program manager. Contractors are authorized to kennel their CWDs in the same facility as other CWD's (no more than one dog per kennel cage). The availability of any facility is subject to change at the Government's discretion. Kenneling of CWDs with US MWD's is not authorized unless prior authorization has been given by the USFOR-A Working Dog PM or higher authority.

7.1.2     Lodging. The Government will provide lodging for all contract personnel. Facilities may not be hard facilities.   Contractor personnel may be housed in tents or other temporary facilities as conditions warrant. Latrine and shower facilities will also be provided based on the site specific situation and available infrastructure. NOTE: Although most operating locations have facilities available for both genders, some locations may not have female facilities available.

7.1.3     The Contractor shall maintain a safe, clean, and healthy work environment for both handlers and canines (IAW AR 190-12).

7.2     Government Furnished Services:

7.2.1     Utilities. The Government will provide water, sewage service, electricity, heat, and air conditioning to all facilities being utilized by Contractor, as conditions permit. The Contractor shall exercise responsible use of all utilities.

7.2.2     Phone. The Government will provide DSN phone service connection at Forward Operating Bases when/where available. Commercial/VOIP or cell phones are the responsibility of the contractor. The use of

AMK9-0072

the U.S. based phone service is only available for as long as the United States is lead nation and maintains the communications system as it is currently configured.

7.2.3 Automation. The Government will provide computer(s), and network access at Kandahar/Bagram Air Base or when/where available. This is subject to change if NATO takes responsibility for network communication. Additional charges for internet access once the U.S. information architecture is redeployed may be charged to the contractor. The use of the U.S. based computers, network, and internet access service is only available for as long as the United States is lead nation and maintains the communications system as it is currently configured. All contractors who utilize Government computers will adhere to all establish information assurance policies to include but not limited to; OPSEC (Operations Security), INFOSEC (Information Security), COMSEC (Communications Security) and COMPUSEC (Computer Security).

7.2.4 Laundry. Laundry service as well as self-service laundry is provided. As long as U.S. is lead nation the cost for services is waived, however once KBR LOGCAP is no longer available the contractor will have to abide by costing arrangements set forth for all contractors.

7.2.5 Morale, Welfare, and Recreation (MWR). MWR service is provided by the Government at FOBs and at Precinct Reconstruction Team (PRT) sites. The Contractor may provide MWR facilities/equipment as desired, at contractors expense.

7.2.6 Food. Meals will be furnished to contractor personnel.

7.3 Medical.

7.3.1 Veterinary Care. Veterinary care will be provided by the Government while operating within the Combined Joint Operations Area-Afghanistan. The contractor shall reimburse the Government for all costs associated with provided care and when utilizing the U.S. military veterinary services in accordance with the pricing schedule located at Appendix G. Veterinary service reimbursement will be made through a mechanism to be determined at a later date. This service remains available for as long as the U.S. deploys this service.

7.3.2 The contractor shall submit a copy of all dogs' vaccination/health records to the U.S. military veterinarian for review. Contractor shall coordinate with the Working Dog PM and COR for initial examination within 72 hours of arriving in the AOR. Working Dog PM and COR will coordinate with regional U.S. Military veterinarians to complete the in theater health verification. Care provided by U.S. Military veterinarians will be documented in veterinary treatment records (VTR); VTRs remain the property of USG. Military veterinarians may provide contractor with copies of VTR if requested and resources allow.

7.3.3 All CWDs will be required to have a medical examination performed annually by a U.S. military veterinarian. The Government reserves the right to have any dog examined by a U.S. military veterinarian at any time to determine serviceability, health, and welfare of the dog.

7.3.4 The Contracting Office or COR, upon recommendation of a U.S. military veterinarian, may reject any dog not meeting minimal health standards.

7.3.5 Air Transportation. Transportation to theater will be provided by the Contractor (i.e. to Kuwait) at the Contractor's expense. Contractors will not use the CRCs for onward air movement to theater. Inter theater transport to final destination or for any other operational missions will be the responsibility of the Government. Personal travel due to emergency leave, regular leave, or transitions will be the responsibility of the Contractor. NOTE: Theater MEDEVAC is available for CWD's. CWD's receive the same priority for MEDEVAC as human personnel, IAW USCENTCOM policy and will be prioritized based on severity of

AMK9-0073

injury. When CWD's are transported for medical treatment they should be accompanied by the handler whenever possible.

7.4 ~~Government Furnished Materials. The contractor shall be responsible to provide any materials not specifically identified as being provided by the Government required to accomplish requirements of this PWS~~

7.5 Government Furnished Property. The following items are, or will be, for the contractor's use. Additional ~~property will be added as required for the accomplishment of the mission or as requested by the contractor. Not all requests for Government Furnished Property will be granted. The contractor is responsible for the maintenance, repair, or replacement of these items as applicable. These items shall be returned to the Government in good working condition at the end of this contract~~.

- Protective clothing (e.g. Helmet, Body Armor)
- Computer(s)
- Kennels
- Other property as negotiated with the Government

7.6 Contractor Furnished Property. The following items shall be provided for contractor personnel use, by the contractor, at the contractor's expense. The contractor is responsible for the maintenance, repair, or replacement of these items as applicable.

- Protective clothing other than those provided by the CRC
- Patrol Narcotics Detector Dogs (PNDD)
- Patrol Explosives Detector Dogs (PEDD)
- Bite suits, leashes, collars, dog food, and other items necessary to support CWD operations
- Canine Explosive Scent Kits (CESK) and Narcotics Or Contraband Training Aids

## 8. GENERAL INFORMATION:

8.1 Place of Performance. Various permanent and temporary locations (Forward Operating Base and Provincial Reconstruction Team locations) in the USFOR-A AOR. These will be divided in RC-N, RC-E, RC-S, RC-W and RC-C according to the Battlefield Commander requirements on the ground.

8.2 The contractor shall be required to operate in Hostile Fire (HF) or Imminent Danger (ID) areas at FOBs, or PRTs. The Contractor will ONLY operate in this manner while serving with U.S. or Coalition Forces.

8.3 The contractor shall be required to operate a kennel in accordance with industry standards, Army Regulation 190-12 and Army Pamphlet 190-12.

8.4 Quality Control: The contractor shall provide a comprehensive Quality Control Plan (QCP) for all work required in this Performance Work Statement. The written QCP shall be submitted to the Contracting Officer Representative (COR) for acceptance no later than the pre-performance conference. The COR will notify the contractor of acceptance or required modifications that shall be made to the plan prior to contract start.

8.4.1 The plan shall include, at a minimum:

8.4.1.1 A description of the inspection system to cover all services listed on the Services Summary (Section 2). The description shall include specifics as to the areas to be inspected on a scheduled and unscheduled basis, frequency of inspections, submission of QC schedule and the title and

AMK9-0074

organizational placement of the quality control inspectors (QCIs). Additionally, control procedures for any Government provided keys or lock combinations shall be included, control procedures for explosives and narcotics training aids will also be included.

8.4.1.2    A description of the methods to be used for identifying and preventing defects in the quality of service performed.

8.4.1.3    A description of the records to be kept to document inspections and corrective or preventive actions taken. This includes the use and distribution of required forms and reports.

8.5    Quality Assurance: The Government may inspect the contractor's job performance at any time during the duration of this contract. The Government will appoint Quality Assurance (QA) personnel who are responsible for executing the Government's Quality Assurance Surveillance Plan (QASP). This plan is a living document, and may change throughout the life of the contract to ensure contract standards are maintained. The contractor shall be notified if performance defects are identified and validated by QA personnel. Disputes between QA and contractor personnel over performance standards shall be referred to the Contracting Officer for final determination. The Government reserves the right to inspect all contractor performance and detection team certifications to ensure services are received.

8.6    Government inspection rates and/or methods may vary throughout the life of the contract to ensure PWS standards are maintained. Contractor shall be responsible for providing its own Quality Control inspection system, and shall not rely upon the Government's Quality Assurance program to identify performance defects.

8.7    The records of contractor inspections shall be kept and made available to the Government throughout the contract performance period and for the period after contract completion until final settlement of any claims under this contract.

8.8    Hours of Operation:

8.8.1    Normal duty schedule is based on a 50-hour work week. If the battle space owner requires 24/7 coverage, additional CWDs will need to be fielded in order to provide adequate coverage. Additions to numbers of dogs will be made only with the approval of the USFOR-A Working Dog PM. Battle space owners will need to coordinate their requirements with their respective Regional Command (RC) who will in turn coordinate with the USFOR-A Working Dog PM. Surge requirements or other contingencies may arise due to mission requirements. Use of CWDs in a surge capacity should be an exception and not the rule. Battle space owners will coordinate with the KO and USFOR-A Working Dog PM when a surge is required. Contractor is responsible to maintain schedules to meet mission and provide for the health, welfare, and morale of the handlers and CWDs.

8.8.2    Recognized Holidays are all federal holidays. The contractor may be required to work on these days based on mission need.

8.8.3    The U.S. Government reserves the right to direct mission locations and operating hours of PNDD and PEDD teams assigned to accomplish mission requirements. Temporary deployments to an alternate work site can be immediate (on-short notice), based on the requirements of the Government and will be coordinated with the USFOR-A Working Dog program manager. Contract handlers will utilize their dog crates (transportation carriers) as their temporary kenneling facilities during short term deployments or as needed. Changes in PNDD, PEDD team location and operating hours will be at no extra cost to the U.S. Government provided such changes do not impose additional costs on the contractor.

8.9    Security Requirements:

8.9.1    Physical Security. The Contractor is responsible for safeguarding all Government property IAW AR 190-11 and AR 190-51. At the close of each work period, Government facilities, equipment, and materials shall be secured, lights and water turned off, heat or air conditioning set to minimum acceptable temperatures, and all doors and windows secured.

8.9.2    Post Passes and Identification.  The contractor shall obtain post passes and identification cards for all employees and vehicles.  Contractor shall comply with current vetting procedures at each respective location. There is currently not a standard for USFOR-A Facility access in-place.  The contractor will commence processing through COR/USFOR-A Force Protection immediately upon notification of acceptance of contract.  Processing is extensive and can take up to a month to compete.  The contractor's identification card shall clearly identify personnel as contractor employees.  Contractors prior to deployment will obtain Common Access Cards at the CRC.  Contractors will attain FOB access passes once in theater.

8.9.3    The contractor shall obtain and return all Common Access Cards (CAC) from terminated employees within 24 hours of returning from a deployed location. CAC cards will be retained by local military Force protection officer for disposition to the COR.

8.9.4    The contractor shall obtain and return all identification cards and passes from terminated employees within 24 hours of termination.  All returned local identification will be turned over to the FOB Force Protection Officer for disposition.

8.9.5    Key Control.  The contractor shall establish and implement a key control plan IAW AR 190-11.  Controlled access roster of designated key custodian and alternates will be established.  Key control personnel will be responsible for 100% accountability for issue and return of keys.  A 100% monthly inventory will be accomplished.  Any lost or stolen keys will be immediately reported to the site Provost Marshal.  Keys are considered sensitive items.  Upon change of key custodian, a 100% inventory will be conducted.

8.9.6    The contractor shall obtain keys from all terminated employees within 24 hours of termination.

8.9.7    Narcotics and Contraband Training Aids.  The Provost Marshal in concert with the contractor will approve the location for storage and securing of narcotics training aids.  Narcotics training aids will be utilized for training purposes only.  No narcotics training aid will be authorized to remain with a CWD team outside the training period or stored outside of the secure facility. .Narcotics will be stored in an approved GSA safe. Narcotics training aids are considered sensitive items.  Any misuse of narcotics training aids subjects contractor employees to the Uniform Code of Military Justice (UCMJ), civil action, or both.  Reports of lost or destroyed controlled substances will be reported to the Provost Marshal immediately upon discovery, but NLT 24 hours after discovery.   Narcotic training aids will be accounted for on a daily joint inventory. Narcotics will be fully inventoried and documented on a monthly basis. The Provost Marshal shall assist with the procurement of narcotic odors unique to the theater of operations.

8.9.8    Explosives Training Aids.  Explosives training aids/scent kits will be stored in a storage facility approved by the Provost Marshal.  Explosives training aids are considered sensitive items.   AR 190-11 and 190-51 provide the structural requirements for explosive storage. Explosives training aids will be utilized for training purposes only. The Provost Marshal shall assist with the procurement of explosive odors unique to the theater of operations. Explosives training aids will be stored in an approved storage facility only.  No exceptions are authorized.  All personnel designated in writing to handle explosive training aids will have completed an explosives safety course, to be validated by Explosive Ordinance Disposal EOD on site.  100% Explosive Training Aids will be inventoried and accounted for daily on a daily joint inventory.  Monthly inventories will be documented.  Any destroyed, lost or stolen explosives will be reported immediately upon discovery, but NLT 24 hours after discovery.  Reports will be provided to Provost Marshal and EOD.  Military EOD will provide technical guidance and serve as the functional support for use/storage/inspection of explosives training aids.  Strict physical security and control procedures shall be applied to prevent the misuse or theft of explosives used as training aids obtained from any source. The Provost Marshal must approve procedures.

8.10    Personnel:

AMK9-0076

8.10.1  Kennel Master (KM) / Project Manager (PM).  Contractor shall provide an on-site Contract Kennel Master / Project Manager who shall be responsible for contract performance and have the ability and authority to act on behalf of the contractor.  Prior to contract start, the name of this person and his/her alternate(s), who can act for the contractor when the manager is absent, shall be designated in writing to the Contracting Officer or COR.  The contractor's Kennel Master / Program Manager will have at least six years prior experience as a senior military or civilian working dog handler and four years experience as a Kennel Master. The nature and extent of this experience shall be such that the individual(s) has the capability of effectively managing a PNDD or PEDD program of the scope and magnitude described herein.  The Kennel Master will be the direct POC with a Military Program Manager and coordinate evaluations and the examination of documents and certifications.  At no time will a Military Working Dog Program Manager be denied access to a CWD facility or kennel.

8.10.2  Kennel Master / Project Manager or alternate will participate in meetings chaired by the Government, which will be held on a periodic basis, to integrate and coordinate support for the canine services effort.  The Kennel Master, Project Manager, Operations Manager, or Training Manager must have a valid and current security clearance SECRET, minimum, in order to attend specific Government meetings.

8.10.3  Kennel Master / Project Manager or alternate shall be available 24 hours by personnel contact or phone.

8.10.4  Kennel Master / Project Manager:  Serve as the contractor's site supervision; they retain overall responsibility for the performance, logistics, physical security, operational standards, health, welfare, morale, vet care and administration of the contract.  Violations of KM/PM performance of duty, violations of established procedures will result in recommendation for relief by the COR/Working Dog PM.  COR/Working Dog PM will recommend to the contractor levels of action to mitigate any substandard performance or violations of the contract.  The Government reserves the right to initiate removal of an employee immediately upon notification of a violation of established procedures.

8.10.5  The contractor shall provide sufficient CWD Trainer/Supervisor(s) to oversee all CWD training under this contract.

8.10.6  Upon request, the contractor shall make available to the Contracting Officer, or COR, documentation of any employee's training, qualifications, clearance, or other documentation necessary to determine the handlers ability to perform under this contract.

8.10.7  Kennel Masters, Trainers, and Handlers who come in contact with Government personnel in the performance of their duties shall be able to read, write, speak, and understand English and have passed a test in English as a Second Language (ESL).

8.10.8  All employees are subject to the laws, rules, and regulations of the respective Government installation on which they are operating.  Failure to follow these laws, rules, and regulations may result in loss of privileges, barment from the installation, or other administrative action.  The contractor must be prepared to provide the Government with the necessary administrative information for contracted handlers (including SSN, if US citizen or FIN if a non-US citizen).  This information will be used to determine if any contracted employees with former Government service hold valid security clearances and for the issuance of DOD CAC Cards.

8.10.9  All employees may be subject to the laws, rules, and regulations of the Government of Afghanistan.

8.11    Job Descriptions and Qualifications:  See Appendix B

AMK9-0077

8.12    Performance of services during crisis declared by the National Command Authority (NCA).  Services to be performed under this contract have been determined to be essential for performance during crisis and, according to Department of Defense Instruction DODD 3020.26, Continuity of Operations (COOP) Policy and Planning, and Army implementation thereof, it is determined that the contractor will be required to perform during crisis unless otherwise directed by an authorized Government representative.

8.13    Uniforms.  Contractor shall be required to wear uniforms that distinguish them as members of their company.

8.14    Phase-In Period.  In such cases where this contract replaces an existing contract, the Contractor shall work with outgoing Contractor to ensure that transition is successfully accomplished without any gaps in service.  The incoming Contractor will commence relief-in-place/transfer of authority (RIP/TOA) or assumption of contract service responsibility 30 days prior to assuming the mission.

8.15    Contractor shall be required to overlap with future contractor (if necessary) to facilitate continuity of service for the Government.  Period of overlap will begin approximately 90 days prior to contract start date.

8.16    Performance Metrics.  Performance metrics are outlined in the Quality Assurance Surveillance Plan (QASP) located in Appendix F.

8.17    Invoicing

  8.17.1  The Government may deduct money from the Contractor's invoice for failing to meet requirements of the QASP.

  8.17.2  The amount deducted will be prorated per day based on the monthly rate.

  8.17.3  Contractor shall only invoice for certified teams that are at their designated location and ready for duty.  The Contractor shall not invoice for contingent teams.

8.18    The contractor shall be responsible for non-tactical vehicles required to perform operations.  For planning, the rental of local vehicles ranges from $1,250 per month to $2,500 per month for vehicles ranging from 10 years old to new respectively.  Note that most local vendors may require a minimum of a 24-month rental on new vehicles.

8.19    Government Furnished Fuel.  The US Government shall provide fuel to the contractor for the performance of the contract work requirements for the basic contract period and all option periods that are exercised by the US Government.  Fuel for contractor vehicles shall be limited to actual consumption in the performance of the contract requirements.  Fuel shall be provided for contractor vehicle(s).

  8.19.1  Within 10 days after contract award, the contractor shall provide: (1) a list of vehicles that will be used during the performance of the contract period to include year, make, model, and license plate number; and (2) the estimated monthly fuel usage, and fuel tank capacity for each vehicle to the Contracting Officer (CO) and the Contracting Officer Representative (COR).  The contractor shall report changes to the contractor's vehicle fleet (additions, removals, or substitutions) to the CO/COR within 10 days of the change.

  8.19.2  Contractor Vehicle Fuel Reporting Requirements:

    8.19.2.1    Contractor Vehicle Fuel Report: Not later than the fifth day of each month, the contractor shall provide actual fuel consumption for contractor-owned vehicles for the previous month to the CO

AMK9-0078

1299

and COR. The reports shall include: (a) a list of vehicles that used fuel during the month to include year, make, model, fuel type and license plate number; (b) the actual number of gallons per vehicle used during the month; and, (c) the date fuel was received for each vehicle during the month.

8.19.2.2　　The contractor shall provide fuel use "estimates" each quarter to the CO/COR, to include the fuel tank capacity for each vehicle. If the contractor determines that additional fuel is required, the contractor shall provide: (1) the new estimated monthly fuel usage, and fuel tank capacity for each vehicle requiring the additional fuel; and (2) the reason for the additional fuel.

8.19.3　The following are prohibited uses of US Government fuel: (1) use for purposes other than executing requirements of the contract (or US Government contracts); (2) use of fuel in excess of what is needed to execute the requirements of the contract (or US Government contracts); and (3) resale, exchange, or transfer. If the contractor knowingly engages in any prohibited use of fuel, the contractor is liable to the US Government for the value of any US Government fuel beyond contract requirements and may be subject to contract termination for cause. If the contract is terminated for cause, the termination will impact future business between the terminated contractor and the US Government.

8.19.4　A United States Forces-Afghanistan approved certification authority must act as the appointed certification authority for this contract. The USFOR-A Office of the Provost Marshal maintains a list of appointed Certification Authorities for the Afghanistan AOR.

AMK9-0079

1300

| Position | Description |
|---|---|
| **Qualifications** | |
| Kennel Master / Project Manager | The Kennel Master is in charge of the Contractor's CWD program at the designated FOBs in Afghanistan. Responsible for overall management of contract dogs, health, morale and welfare, team utilization, training, and coordination of services to support the program. At smaller FOBs with less than 6 dogs, the Kennel Master may be required to serve as trainer/Kennel Master. At least 6 years prior military/law enforcement canine experience. Responsible for administration, logistics, operations, physical security, health care and maintenance of all contractors, contract facilities and CWD teams. |
| Minimum of 6 years experience as a handler in addition to 4 years as a Kennel Master. (IAW AR 190-12). | |
| Handler | Each handler is personally responsible for his or her assigned dog. The handler trains, employs, feeds, cares for, cleans, and otherwise maintains his or her assigned dog in every way. The dog depends directly on the handler and, in keeping with the principle of one dog — one handler, the dog should never have to depend on anyone other than the assigned handler. The handler is responsible for the cleaning and maintenance of the dog's kennel. The handler is directly responsible to the Kennel Master for the operation, maintenance, and cleaning of the kennels, kennel support building, training area, exercise area, obedience course, and any other areas or equipment that are included in the kennel facility. The handler is responsible for maintaining accurate, complete, and current utilization records. |
| Minimum of 2 years experience as a handler. Must be third party trained (e.g. Prior military training from the 341st CWDTS or Municipal Government-Sponsored Course) as a narcotics or explosives detector handler prior to arriving in Afghanistan. Minimum of 1-year experience as a narcotics or explosives detector handler. | |
| CWD Trainer/Supervisor | The CWD Trainer/Supervisor is personally responsible for the planning, supervision, maintenance of training records, security of training aids, and the conduct of training CWD under the |

AMK9-0080

|  | contract. The Contractor's Trainer will ensure the CWD training program is in keeping with the standards of AR 190-12, guidance outlined by the Certification Authority, and the CWD contract. The CWD Trainer will ensure that the CWD training program is geared towards the keeping with the principle of one dog — one handler. The CWD Trainer is directly responsible to the Kennel Master for the operation and maintenance of training aids, records, and training areas, exercise area, obedience course, and any other training areas or equipment that are included in the kennel facility. The CWD Trainer is responsible for maintaining accurate, complete, and current training records. Responsible for accountability of sensitive items. |
|---|---|
| Minimum of 4 years experience as a handler. Must be third party trained (e.g. Prior military training from the 341st CWDTS or Municipal Government-Sponsored Course). Minimum of 2-year experience as a narcotics or explosives detector handler. | |

AMK9-0081

**Extracted from APPENDIX C to Performance Work Statement**

**CONTRACT WORKING DOG CERTIFICATION STANDARDS**

**1. Initial certification standard of contract working dog teams**

Certification standards are designed to ensure that CWD teams meet or continue to meet minimum standards for CWD proficiency

Initial certification procedures will include –

    a. Present the training aid twice.

    b. Conduct certification in accordance with CWD initial training (that is, on a 6–inch leather and/or nylon leash.)

    c. Conduct certification in search areas that mirror the areas the team is expected to search during a real operation or mission.

    d. Plant explosive training aids and narcotic training aids in separate search areas.

    e. Use a minimum of 3 different training areas for the certification. Training areas must present a realistic environment to the CWD team. Examples include vehicles (20 or more), building, open areas.

    f. Use 1 blank problem (no aids).

    g. Conduct prolonged search (20 minutes) in a search area.

1.1.    PATROL CWD CERTIFICATION: Certification Standards/Training Aids for Each Type of CWD

    1.1.1.    Patrol explosive detector dog and patrol narcotic detector dog certification

    1.1.2.    The use of obedience commands to demonstrate the level of communication and understanding that exists between a handler and his dog.

    1.1.3.    On command from the handler, the patrol dog must execute the commands of SIT, DOWN, HEEL, and STAY.

        The dog must execute the commands correctly when the dog is located at the handler's side and when the handler is positioned at a distance of 50 feet with no more than 1 correction per 5 commands. The commands can either be hand gestures or verbal commands. The commands STAY and HEEL are rated critical. The commands SIT and DOWN are rated semi-critical.

    1.1.4.    While off–leash, the patrol dog will maintain a proper heel position while the handler starts, stops, changes speed, and changes direction. This is rated semi-critical.

    1.1.5.    Recall will consist of calling the dog from a distance of 50 feet and stopping the dog at a distance of 25 feet with a SIT or DOWN command. The dog will then be called to HEEL position with a voice command. Recall is rated semi-critical.

    1.1.6.    The patrol dog must negotiate the obedience/obstacle course (semi-critical) at a marching pace, on–leash or off–leash, by command of its handler. When off–leash, the patrol dog will maintain the heel position while the patrol dog handler walks the dog through the course. Random stops will be made between obstacles, and some obstacles will be passed to ensure that the dog is responding to the handler's direction and not simply "running the course." There will be no more than 2 corrections per command when conducting the obedience course. NOTE: Obedience/obstacle courses are not normally available in

AMK9-0082

theater. For recertification's conducted in-theater, the certifying authority will use his/her discretion to create a similar training problem to test the dog's basic obedience.

1.2. Controlled aggression

1.2.1. False run (critical). When commanded to STAY, the CWD must remain in the heel, sit, or down position, on–leash, and not attack when a person approaches the CWD team.

1.2.2. False run into a bite (critical). When commanded to STAY, the CWD must remain in the heel, sit, or down position, on–leash, and attack only on the command of GET HIM at which time the dog is taken off leash. The CWD must complete the attack, bite, and hold the decoy, hold with a full mouth bite for at least 10 seconds, and release on the command OUT. Only 1 verbal correction is authorized and the CWD must release the bite on the second command of OUT. The CWD must return to its handler when commanded to HEEL.

1.2.3. Search and attack (critical). When commanded to STAY, the CWD must remain in the heel, down, or sit position while the handler searches a decoy off–leash. The search will consist of patting down both arms, both legs, and the torso of the decoy. During the search, the CWD must attack the decoy without command if the decoy tries to escape or attacks the handler. The CWD must complete the attack, bite and hold the decoy, and release on the command OUT. Only 1 verbal correction is authorized and the CWD must release the bite on the second command of OUT. The CWD must return to its handler when commanded to HEEL.

1.2.4. Standoff (critical). When commanded to STAY, the CWD must remain in the heel, down, or sit position, while off–leash. Only 1 command of GET HIM will be given. The correct response for this task is the dog will cease pursuit of a decoy on the command OUT, and then on command of HEEL, the dog will return to the heel position. For a standoff only 1verbal correction is authorized and the CWD must stop pursuit on the second command of OUT. The CWD must respond to the command without biting the decoy. The dog is not allowed to nip and bite at the agitator after being commanded to out.

1.2.5. Escort (semi-critical). When commanded to HEEL, the CWD team, with dog on leash must escort the decoy for at least 20 yards, with the escort no more than 6 feet from the decoy. The CWD must stay in the heel position, on–leash, and will not attack the decoy.

1.3. Building search (critical)

1.3.1 The CWD will find a decoy inside any structure, and show the handler where the decoy is located. This task will be performed on leash and the dog will locate the decoy by scent and perform any one or a combination of the following: scratching, biting, barking, jumping, or stop and stare.

1.4. Gunfire (critical)

1.4.1. The CWD will not be adversely affected by gunfire; if/when another person is firing in close proximity to the team. Gunfire will not be a command for the dog to attack. The CWD will attack only on command. The CWD will hold its position while another person is firing a weapon in close proximity (6 feet) to the team. The CWD aggressing on the handler or the person firing the weapon in close proximity constitutes failure unless the handler gives the command for the dog to attack.

1.5. Scouting or patrolling (critical).

AMK9-0083

1.5.1. The CWD will be able to find people by scent, sight, or sound. Proficiency in scouting or patrolling requires demonstrating the ability to detect and respond to the scent of decoys that are hiding upwind at least 100 yards but not more than 200 yards, and follow the scents to the decoys locations. The CWD will pursue and attack only on command.

1.6. Obedience Course (semi-critical)

1.6.1. The obedience (Obstacle/Agility) course is to be performed with the dog maneuvering under the control of the handler between obstacles. The obedience course will include dog-walk, stairs/steps, A-frame, window hurdle, three other hurdles, tunnel, and three barrels. Only 1 physical correction per 5 commands is allowed. NOTE: Obedience/obstacle courses are not normally available in theater. For recertification's conducted in-theater, the certifying authority will use his/her discretion to create a similar training problem to test the dog's basic obedience.

## 2. DETECTION CWD CERTIFICATION: Certification Standards/Training Aids for Each Type CWD

2.1. General Standards

2.1.1. A dog will be allowed only two attempts at certification. If it fails the second attempt, this is grounds for disqualification as a CWD. After the first failure a training plan will be created in an effort to bring the CWD up to certification standards.

2.1.2. Two false responses in an individual training location are grounds for failure. (Note - a dog can pass certification with up to two false responses as long as they do not occur in the same training location).

2.1.3. The training aids will be hidden at heights from zero to six feet, and depths from zero to three feet. NOTE: Training aids will not be buried in the ground.

2.1.4. All training aids must be hidden from view and have, at a minimum, a 30-minute "sit time" before the dog begins to search.

2.1.5. At least one search problem will require the dog to work at least 20 minutes. A dog must show the capability to complete all searches and will not be allowed a rest/break any time prior to the 20 minutes (exceptions may be made at the evaluator's discretion depending on temperature and weather conditions).

2.1.6. If multiple dogs make a common errors during certification, adjustments to the certification may be made at the evaluator's discretion (i.e. false responses may be ignored, or a problematic aid placement can be "thrown out" and compensated for with an additional aid placement later on in the certification).

2.2. Evaluation Standards

2.2.1. The dog must indicate the presence and location of the training aid using a passive final response. The passive final response should normally be a sit. A down may also be counted as a correct final response if the dog has pinpointed an aid on or near the floor or when the dog has inserted itself under some obstacle in order to pinpoint the aid.

2.2.2. A dog making an aggressive response during the evaluation will fail to certify. A response is considered aggressive when the dog attempts to bite, scratch, or excessively nudge the training aid or area containing the training aid. Scratching on doors during detector searches will be counted as an aggressive response.

AMK9-0084

2.2.3. If a dog indicates a final response during the course of a search problem, this behavior can be classified as a correct response, a fringe response, or a false response. When classifying a final response, the evaluator considers the dog's behavior only.

2.2.4. A correct response is normally defined as an unassisted or "un-cued" final response within a radius of 6 feet of odor source. The dog's final response should be as close to the odor as possible, taking into account any intervening obstacles or barriers.

2.2.5. In the event the evaluator believes the dog can and should move closer to the training aid, he/she will tell the handler "Yes--Not at Source," and direct the handler to take appropriate action.

2.2.6. In the event of a fringe response, the evaluator will tell the handler "fringe" and direct the handler to take appropriate action. Whether or not the evaluator defines the response as a correct response will depend on whether the dog exhibited a distinct change of behavior prior to the response, whether other dogs in the evaluation exhibit changes of behavior in approximately the same area, and how efficiently the dog responds to encouragement to more exactly localize the training aid. Three fringe responses over the course of certification may be grounds for failure.

2.2.7. A false response is normally defined as a final response with no training aid present within a radius of six feet. If the dog makes a false response, the evaluator will tell the handler "No" and instruct the handler to move out of the immediate area and continue the search.

## 3. HANDLING STANDARDS

3.1. Searches may be: scan the area, systematic presentations of productive locations, or a detailed search of the area.

3.1.1. The handler has one attempt to search to clear/check each area. Rechecking that area will not be allowed once a dog has completed a search of an area, unless the dog pulls the handler back to an area, or in special circumstances as determined by the evaluator. The handler is not allowed to "lead" or "guide" the animal back to the area in any way, nor is he/she allowed to linger near the area any longer than necessary to clear neighboring areas. Dogs that show a change of behavior to odor from a training aid, is considered a search. The dog should localize the aid and perform a final response.

3.1.2. The handler may "scan" an area and if the dog does not exhibit a noticeable change in behavior or "alert" on odor, then the handler may work the area again by means of systematic presentations or detailed search.

3.1.3. If the dog shows a noticeable change of behavior, then the handler will assist the dog to find source by stepping closer and making presentations pursuant to a detailed search, and he/she may retrace his/her steps a few feet in order to thoroughly cover the area the dog has shown interest in.

3.1.4. If a dog has stopped moving in the vicinity of a training aid, and also stops actively investigating the area of odor (i.e. looks at the handler, stops and stares), but does not final response, the handler must step off and make his/her next presentation. Standing still or failing to make a presentation will be considered "cuing" the dog and will be grounds for termination of the evaluation.

## 4. EXPLOSIVE AIDS

4.1. Evaluators will conduct explosives certification using twenty (20) explosive training aids. If a dog completes the certification using all required locations and has no more than one miss and two false responses (not in the same area), it will be certified.

## 5. DRUG AIDS

5.1. Evaluators will conduct the drug certification using twenty (20) drug aids. If a dog completes the certification using all required locations and has no more than one miss and two false responses (not in the same area), it will be considered certified.

AMK9-0085

# 6. CERTIFICATION

6.1.  PEDD Teams shall be certified as explosive detection teams prior to being employed for explosives detection. This will be accomplished by demonstrating minimum proficiency (95 percent or better detection rate) to a DoD approved Certification Authority.

6.2.  PNDD Teams shall be certified as drug detection teams prior to being employed for drug detection. This will be accomplished by demonstrating minimum proficiency (90 percent or better detection rate) to a DoD approved Certification Authority.

6.3.  Initial certification will be conducted by a DoD approved Certification Authority in CONUS, at a CRC or other pre-designated location, prior to deployment, and will always be conducted at the contractor's expense.

6.4.  Contractor shall conduct training so a PEDDs detection rate is 95 percent or better on each of the following explosives: commercial dynamite (Gelatin and Ammonium Nitrate); military dynamite; water gel (TOVEX); TNT (trinitrotoluene); smokeless powder; C-4 plastic explosive; detonating cord; potassium chlorate; sodium chlorate at a minimum., All PEDDs shall be trained with a passive response.

6.5.  Contractor shall conduct training so a PNDDs detection rate is 90 percent or better on each of the following drugs: heroin, MDMA (ecstasy), marijuana, cocaine, methamphetamine and hashish.

6.6.  Teams that do not pass recertification must undergo 30 working days of sustainment training before being reconsidered for certification. NOTE: The USCENTCOM CWD PM is the waiver authority for this requirement and will determine the appropriate number of days of sustainment training based on an assessment of the individual CWD's training deficiency. Additionally, the number of allowed false responses will be limited to no more than one (1) during subsequent recertifications.

6.7.  The PEDD handler, during the certification process, will demonstrate knowledge of proper search, detection, and response procedures. Additionally, the handler's proficiency is evaluated by having the handler demonstrate detailed knowledge of:

> (1) The characteristics of each of the explosives the team is trained to detect.
>
> (2) How these explosives may be used in explosive devices.
>
> (3) The requirements for safe handling, transportation, and storage of these explosives.
>
> (4) The requirements for conducting safe training exercises.
>
> (5) Basic K9 first aid.

AMK9-0086

**EXHIBIT B (cont.)**
**Extracted from APPENDIX D to Performance Work Statement**
**RULES FOR THE USE OF FORCE FOR DoD CONTRACTOR EMPLOYEES**

1. DoD civilian personnel and DoD contractor employees armed for personal protection or contract security/private security companies (PSC) work have the inherent right to exercise self-defense in response to a hostile act or demonstrated hostile intent.

2. DoD civilian personnel and DoD contractor employees armed for personal protection or contract security/PSC work are not combatants. Taking a direct part in hostilities (e.g. engaging in combat actions with Coalition forces) or performing law enforcement activities is prohibited.

3. Interaction with Coalition and Afghanistan National Security Forces (ANSF):

   a. Cooperate with Coalition and ANSF and comply with theater force protection policies.

   b. Do not avoid or run Coalition or ANSF checkpoints.

   c. If authorized to carry weapons, do not aim them at Coalition or ANSF.

   d. Report all incidents of weapons discharge/use (to include accidental discharges) to applicable ISAF or CJTF-82/101 Unit.

4. Use of deadly force.

   a. Deadly force is that force which one reasonably believes will cause death or serious bodily harm.

   b. Deadly force is to be used only when all lesser means have failed or cannot reasonably be employed.

   c. For DoD civilian personnel and DoD contractor employees armed only for personal protection, use of deadly force is permitted only for individual self-defense when there is a reasonable belief of imminent risk of death or serious bodily harm.

   d. For DoD civilian personnel and DoD contractor employees armed for contract security/PSC work, use of deadly force is permitted for individual self-defense and in defense of others when there is a reasonable belief of imminent risk of death or serious bodily harm. Details regarding this authorization will be provided, for DoD civilian personnel, by appropriate DoD authorities and, for DoD contractor employees, within the terms and conditions to which the contractor employee is assigned. DoD contract security can be specifically authorized to protect designated mission essential and US national security equipment/property with force, including deadly force.

5. Graduated use of force:

   a. A reasonable amount of force that is necessary under the circumstances shall be used.

   b. The following are some techniques you may use, if their use will not unnecessarily endanger you or others:

      (1) Shout – verbal warnings to halt in native language.

      (2) Show – your weapon and demonstrate intent to use it.

AMK9-0087

(3) Shove – stop the threat using physical force.

(4) Shoot (use deadly force) – to remove the threat only when necessary as authorized in para 5.

6. If you must fire a weapon, fire only aimed shots with due regard for the safety of innocent bystanders and immediately report incident and request assistance.

7. Local Civilians: Treat local civilians with dignity and respect. Make every effort to avoid civilian casualties. You may stop, detain, search, and disarm local persons if required for self-defense as stated in the terms of this contract. All civilians will be treated humanely and any detained persons or property will be reported immediately and turned over to the host nation police/security or coalition forces as soon as possible.

8. DoD civilian personnel and DoD contractor employees, whether armed for personal protection or serving as contract security/PSC, shall not engage in combatant activities, combat-like operations, or offensive operations alone or in conjunction with US/Coalition or ANSF.

9. No person or force is declared hostile for purposed of the RUF. The Rules of Engagement applicable to U.S., Coalition or ANSF are not the rules that apply to DoD civilians or DoD contractor personnel.

10. Actions taken in self-defense are not considered combatant activities, combat-like or offensive operations and remain available to respond to hostile acts or demonstrated hostile intent.

AMK9-0088

# APPENDIX 3

| | |
|---|---|
| **From:** | LaTasha Freeman [freemanlatasha07@yahoo.com] |
| **Sent:** | Wednesday, November 16, 2011 6:02 AM |
| **To:** | Richard Dorough |
| **Subject:** | LaTasha Freeman's Dog Bites Follow Up |

Hi This is LaTasha Freeman. This is my email address where I can best be contacted. Yes, the dog did bite me in several area and tore my coat. If you need to contact me for anything, this is my best contact.

*Ms. LaTasha*



1

AMK9-0001



**American K-9 Detection Services, LLC**
735 Primera Boulevard, Suite 215
Lake Mary, Florida 32746
Email: Info@amk9.com · Web: www.amk9.com

Phone: 407 333-8848
Fax: 407 333-0046

On 9 November 2011 around 1130, I was standing at the ECP area waiting to be a ground guide. I noticed to my left that the door of dog shack was moving back and forth like a dog was trying to get out. When I looked again, the door of the dog shack was open and this is when I saw the dog. The dog was not tied up at all. The dog came toward me and jumped up on me. The dog then jumped up on my left shoulder biting down and then the dog bite down on my left forearm which ripped my coat. The dog also bite me on my left thigh area and then it started to snap + bite down on my right butt and pulled on my right pocket jean. After that, I assume it was local person who pulled the dog off of me. I saw one dog trainer conducting a search on a vehicle with a vehicle but didn't see the other trainer later on after the incident. I told the dog trainer (handler) that the dog had bite me and tore my coat. He laughed and told me to a complaint. One of them did apologize but both thought it was funny.

LaTasha Freeman

Nothing Else Follow

AMK9-0002

# APPENDIX 4

CAUSE NO. CV-13-246

| LATASHA FREEMAN | § | IN THE DISTRICT COURT |
| | § | |
| Plaintiff, | § | |
| | § | |
| VS. | § | |
| | § | 198th JUDICIAL DISTRICT |
| AMERICAN K-9 DETECTION | § | |
| SERVICES, L.L.C.; and HILL COUNTRY | § | |
| DOG CENTER, L.L.C., | § | |
| | § | |
| Defendants. | § | BANDERA COUNTY, TEXAS |

## AFFIDAVIT OF LATASHA FREEMAN

STATE OF TEXAS )
)
COUNTY OF BANDERA )

BEFORE ME, the undersigned authority, on this day personally appeared **LATASHA FREEMAN**, who swore or affirmed to tell the truth, deposes and states as follows:

"My name is **LATASHA FREEMAN**. I am over the age of 18, I am of sound mind, and fully competent and able to testify herein. I have personal knowledge of all the facts set forth herein, and all the facts set forth herein are true and correct."

"Around noon on November 9, 2011, I was with a coworker waiting outside by the entry control point 1, a gate at Camp Mike Spann, for vehicles to arrive through a security checkpoint, so that I could escort the vehicles back to area where they were to be parked. I was standing about 45-50 feet away from an animal shelter. I had been standing waiting for the vehicles for about 10 minutes when I noticed a leash hanging on the latch of the shelter door. I could see the legs of a dog through the shelter door that was partially open. I then saw the dog push the open and walk through the door. I didn't see any AMK9 handlers around the kennel area.

When I saw the dog outside the shelter it started looking around the area where I was standing. The dog started running towards me and jumped at the back of my left shoulder. While the dog was attacking me, she bit my left back shoulder and tried to bite the left side of my face. When she jumped up again I threw my left arm up to protect myself and she clamped down on my left forearm and shook my left arm violently back and forth. The dog then jumped down and bit me on the outside of my left thigh. Then she bit my right buttocks and pulled my pants down with her teeth exposing my buttocks. Then a local civilian contractor pulled the dog off of me by the collar and took the dog away.



EXHIBIT
11

I never saw the AMK9 handler for the dog that attacked me until after the attack. At that time, I saw the AMK9 handler with the dog that attacked me on a leash standing outside the building. I then observed the AMK9 handler put the dog into the shelter and shut the door without himself going inside the shelter. I also saw another AMK9 handler who had been inspecting vehicles with his dog also put his dog into this shelter shortly after and also shut the door."

"Every statement in this affidavit is true and correct."

Further Affiant sayeth not.

_LATASHA FREEMAN_
LATASHA FREEMAN

SWORN TO ME AND SUBSCRIBED before me this 18th day of July, 2014 TO CERTIFY WHICH WITNESS MY HAND AND SEAL OF OFFICE.

SYLVIA MONTOYA GALVAN
Notary Public, State of Texas
My Commission Expires
March 10, 2018

Notary Public for the State of Texas

My Commission Expires __3/10/2018__

565

# APPENDIX 5

| From: | RICHARD DOROUGH [rdorough@amk9.com] |
|---|---|
| Sent: | Wednesday, November 16, 2011 7:46 AM |
| To: | LaTasha Freeman |
| Cc: | mark.muncy@afghan.swa.army.mil; keith.whitcomb@afghan.swa.army.mil; kenneth.murray@afghan.swa.army.mil |
| Subject: | RE: LaTasha Freeman's Dog Bites Follow Up |

Hello,

I tried to contact you on the cell number I was given but kept getting a message that it was out of coverage area. I would like to personally apologize for the incident involving "Callie". The Army guys had built new kennels inside the building at the ECP, Callie jumped over the divider into the opened kennel and exited the building through the opened door. Tops have been put on the kennels and the handler was reprimanded.

Callie is a very playful dog and the soldiers play with her and the other dogs on a daily basis, I can assure you she was just trying to play with you, the soldiers play tug a war and the dogs will mouth them as well as jumping around, I understand this does not make you feel any better and you were not interested in playing with the dog, this was an unfortunate and inexcusable incident, I just wanted you to understand that you were not "attacked" as some are trying to portray the incident, when these dogs are given the command attack, there are serious injuries to follow, I have personally worn the bite suit during training for Callie and when she bites, it is serious. I in no way want to under play the incident as I have stated it was inexcusable, at the same time I want to make sure its not over played as well.

I was told you would like your jacket replaced, I absolutely have no problem with that, please just email me with the brand, size and color so I can make sure I purchase the correct one. I plan to be at Spann this Saturday if you would like to see me and discuss this further.

These Dogs are here to help keep you, me, soldiers and everyone else at these FOB's as safe as possible, the last thing we want is one of our own being injured by the dogs, we are all on the same team over here. If anyone from your unit would like to discuss the dogs, the incident or anything else, let them know I will be there Saturday and will be available for them. Again I apologize to you !!

Very Respectful,

Keith

R. Keith Dorough
Project Manager, RC North Afghanistan
American K-9 Detection Services, LLC. (AMK9)
735 Primera Blvd. , Suite 215
Lake Mary, FL 32746
Office: 407-333-8846
Fax: 407-536-4416
U.S. Cell: 615-708-6002
Afghanistan Contact Info:
Cell: 011-93-(0)785 017 718
rdorough@amk9.com
www.amk9.com

**EXHIBIT**
**I**

Please consider the environment before printing this e-mail.

This email and any files transmitted with it may be confidential or may contain privileged or proprietary information. It has been sent for the sole use of the intended recipient(s). If you have received this communication in error, please notify the sender immediately by email or by telephone and delete this email from your system; you may not disseminate, distribute or copy this email, nor may you disclose its contents to anyone. Please note that any views or opinions presented in this email are solely those of the individual sender, and do not necessarily represent those of AMK9.

1

AMK9-0156

**From:** LaTasha Freeman [freemanlatasha07@yahoo.com]
**Sent:** Wednesday, November 16, 2011 6:01 AM
**To:** RICHARD DOROUGH
**Subject:** LaTasha Freeman's Dog Bites Follow Up

Hi This is LaTasha Freeman. This is my email address where I can best be contacted. Yes, the dog did bite me in several area and tore my coat. If you need to contact me for anything, this is my best contact.

 Ms. LaTasha

This email and any files transmitted with it may be confidential or may contain privileged or proprietary information. It has been sent for the sole use of the intended recipient(s). If you have received this communication in error, please notify the sender immediately by email or by telephone and delete this email from your system; you may not disseminate, distribute or copy this email, nor may you disclose its contents to anyone. Please note that any views or opinions presented in this email are solely those of the individual sender, and do not necessarily represent those of AMK9.

AMK9-0157

# APPENDIX 6



# AMERICAN K-9 DETECTION SERVICES
## CERTIFIED DETECTION SERVICES

| MISSION / INCIDENT / ACCIDENT REPORT | |
|---|---|
| Type of Mission / Incident / Accident | K 9 got out of holding |
| Date / Time occurred | 09/11/11 11:00 |
| Date / Time Reported | 09/11/11 11:20 |
| Person Reporting | W. Ackerman |
| Company / Dept / Unit Involved | AMK 9 |
| Personnel Involved | F Rathokolo |
| Exact Location of Incident / Accident | ECP 1 Main Gate |
| Witnesses to the Incident / Accident | G. Gandawa |

| INJURY TO PERSON (S) / K-9 (S) | |
|---|---|
| Injured Person(s) | NONE |
| Injured K-9 | |
| Company | Honeywell |
| Nature of Injury | NONE |
| Equipment / Persons Causing Injury | K 9 Kallie |
| Details of First Aid / Medical Attention / Hospitalization / Evacuation / Leave | NONE |
| Company / Person Responsible for Machinery / Equipment Involved | Amk 9 F. Rathokolo |

| IMPROVISED EXPLOSIVE DEVICE FINDS | |
|---|---|
| No. of IED's Found | NONE |
| Type of IED | NONE |
| Location of IED | NONE |
| IED Destroyed by EOD Element? | ☐ YES   ☒ NO |

| PROPERTY – DAMAGE / LOSS / THEFT | |
|---|---|
| Description of Property Damaged / Lost / | |

EXHIBIT
J

AMK9-0144

| Stolen | NONE |
|---|---|
| Owner / Person Responsible for Property | Latasha Freeman |
| Nature of Damage / Loss | Small puncture mark on left sleeve of jacket. |
| Estimated Cost of Damage / Property (if available) with written confirmation | N/A |
| Object /Equipment / Substance / Person Causing Damage | K 9 Kallie |
| Stolen Property Recovered | NONE |

## DESCRIPTION – MISSION EVENTS

Describe clearly and accurately the Mission Events / Incident / Accident

K9 Kallie was in her place of holding at ECP 1, with her handler Frans standing outside of the shelter. The Other handler was busy with a sweep on a vehicle. K9 Kallie managed to jump over the divider between the two holding spaces and come out the door on the other side, which was open at the time. K9 Kallie ran out the door and immediately made her way to Frans when she saw another person (Latasha Freeman) standing outside.

In her playful yet rough manner she ran over to her, at this time Frans had noticed this and was in process of getting her under control. She briefly jumped up against above mentioned to play and seek attention, but in doing so snapped her jaw and punctured the left front sleeve of Latasha Freeman's jacket. There was no injury to her as person.

## ACTION

State what immediate measures were taken and any actions still under way or proposed.

Keith Dorough is aware of this incident. I, W. Ackerman, am currently busy getting all necessary details from above mentioned plaintiff for replacement of her damaged jacket.

## ANALYSIS

List what acts, failure to act and/or conditions caused or contributed to the Incident / Accident. What other injury/damage/loss could have occurred?

This was an unexpected incident that has not occurred as yet. Handlers will have to ensure that both doors of the shelter are closed at all times.

## PREVENTION

Detail what actions have been taken or are recommended to prevent future recurrence.

AMK9-0145

| Submitted By: | W. Ackerman |
| --- | --- |
| Position: | |
| Date: | 09/11/11 |

AMK9-0146

# APPENDIX 7

| LATASHA FREEMAN | § | IN THE DISTRICT COURT |
| | § | |
| VS. | § | 198th JUDICIAL DISTRICT |
| | § | |
| AMERICAN K-9 DETECTION | § | |
| SERVICES, L.L.C., and HILL | § | |
| COUNTRY DOG CENTER, L.L.C. | § | BANDERA COUNTY, TEXAS |

## AFFIDAVIT OF WILLARD CHIPMAN

THE STATE OF FLORIDA )
                      )
COUNTY OF SEMINOLE )

Willard Chipman, being sworn, states as follows:

1.    My name is Willard Chipman. I understand the nature of this oath, and I am otherwise competent to testify to the matters stated in this Affidavit. This testimony is based on my own personal knowledge and the facts stated herein are true and correct.

2.    I have been employed for Defendant American K-9 Detection Services LLC (AMK9) at its headquarters located in Lake Mary, Florida since October 10, 2011. I currently serve as Program Manager of Operations in Afghanistan and have held this position since October of 2012. Prior to, I was the Assistant Program Manager of Operations in Afghanistan.

3.    During my employment at AMK9, my work has involved the close coordination with AMK9's overseas field offices, AMK9's corporate office, Rock Island Contracting Center (RICC), and other commercial and government entities to which we currently provide services. My duties include but are not limited to the following: ensuring that all program/project goals and objectives are achieved or exceeded;

ensuring high rates of customer satisfaction; coordinating closely with the customer on all aspects of planning and implementation of program/projects in Afghanistan; and planning and controlling budgets. Prior to my employment at AMK9, I was the Operations Manager for LOCAP III in Iraq. I was directly responsible for the oversight and management of approximately 10,000 employees providing services on over sixteen (16) Forward Operating Bases (FOBs), with an overall budgetary responsibility of $300 million. I have completed multiple courses of study specialized in United States Government contracting during my nine (9) plus years handling the management of government contracts including, but are not limited to, forty (40) hour Federal Acquisition Regulation training, Shaping Accident Free Environment (S.A.FE.), MAXIMO®, and thirty (30) hour Project Management Professional (PMP) course.

4. In my position as Program Manager of Operations in Afghanistan, I act as point of contact with clients for AMK9's contracts with performance in Afghanistan.

5. From my work with AMK9, I am knowledgeable about the nature of the services provided by AMK9 under our contract with the U.S. Department of the Army providing Contract Working Dog ("CWD") Team services in Afghanistan in November 2011 (Contract) and the interplay with the U.S. Department of the Army.

6. It is my understanding the Department of Defense has assigned AMK9's Contract a priority rating of "DO-C9." (Please see the Defense Priorities and Allocation System Rated Orders Certification Statement attached hereto as "Exhibit A.") I contacted Anna Marie Cramblett, Contract Specialist, SWA Support Branch, CCRC-RI, U.S. Army Contracting Command, Rock Island Contracting Center and confirmed my belief the Contract is classified as rated order DO-C9.

2

7.     AMK9 personnel on the Contract are subject to the command of the U.S. Army personnel at Camp Mike Spann in the performance of their duties. Under AMK9's Contract with assigned priority rating "DO-C9" and covering Camp Mike Spann, the Army was specifically required to provide kennel facilities for use by AMK9's CWDs; Designation of the contract kennels was the sole responsibility of the site Military Working Dog Program Manager. AMK9 did not provide the kennels K-9 Kallie allegedly escaped from which were in place at Camp Mike Spann, did not design them, and did not construct them. As per the Contract, they were provided by the U.S. Army based upon their own design and construction techniques for use by AMK9's CWDs located at Camp Spann; it is my understanding AMK9 was not consulted in the building of the kennels, including the decision to not take the center divider to the ceiling. AMK9 personnel were instructed to use them by the military authorities as a part of their CWD duties on the base. AMK9 personnel were following the commands of the U.S. Army when placing the CWD in the kennel from which K-9 Kallie allegedly escaped prior to the alleged incident involving Latasha Freeman.

Further, Affiant sayeth not.

Sworn to and subscribed before me this ⟨illegible⟩day of May, 2014.

YOLANDA SORENSON
NOTARY PUBLIC
STATE OF FLORIDA
Comm# EE138209
Expires 10/16/2015

NOTARY PUBLIC, STATE OF FLORIDA

3

# APPENDIX 8

# Defense Priorities and Allocation System (DPAS)

DPAS RATED ORDERS Certification Statement: This is a Rated Order Certified for National Defense use, and you are required to follow all the provisions of the Defense Priorities and Allocations System Regulation (15 CFR Part 700).

The DPAS provides that DOD contracts are assigned priority ratings to assure that these contracts are afforded production priorities for delivery ahead of unrated orders which includes commercial orders. Ratings are assigned to DOD contracts and enforced in both peacetime and war or emergencies. The contractor is obligated to accept the rated order, to schedule production operations to satisfy delivery requirements of each rated order, and to extend the priority rating to suppliers to assure that the item is delivered in the timeframe requested.

Section 101 of the Defense Production Act (DPA) authorizes the President to require acceptance and priority performance of contracts and orders necessary or appropriate to promote the "National Defense". The President has delegated this authority related to industrial resources to the Department of Commerce (DOC) in Executive Order 12919. DOC implements this authority through the Defense Priorities and Allocations System (DPAS). For purposes of DPAS (and other DPA programs), "National Defense" is defined to include emergency preparedness, prevention, response, recovery, and mitigation activities conducted pursuant to title VI of the Stafford Act and actions to protect or restore critical infrastructure operations (in addition to Military, Energy, and Space Programs). The purpose of DPAS is to:

- Assure Timely Delivery of materials and services from private industry to meet National Defense needs; and
- Provide an operating system to support rapid industrial response to Government Procurement needs in times of emergency.

---

There are two levels of priority for rated orders established by the DPAS, identified by the rating symbols "DO" and "DX"

- **DO** All DO rated orders have equal priority with each other and take preference over unrated orders (including commercial orders).
  *The level used on most rated contracts, including FEMA contracts*

- **DX** (*THE HIGHEST LEVEL*) All DX rated orders have equal priority with each other and take preference over all DO rated and unrated orders.

- **\*\*\* DX ratings are used for special defense programs designated by the President to be of the highest National Priority \*\*\***

**SUPPLIERS (within the United States) MUST:** **(1) Accept or Reject contracts and orders that contain DPAS priority rating for materials and services they normally supply within 15 working days. (2) Provide preferential performance for rated orders to the extent necessary to meet contracted delivery dates. (3) Extend the priority rating to suppliers.**

---

DPAS is designed to be largely self-executing. However, the DPAS provides for special priorities assistance (SPA) to address procurement problems. SPA may be used for purposes consistent with the DPAS regulation, such as:

- Expediting Deliveries, Resolving Delivery Conflicts, Placing Rated Orders, Identifying potential Suppliers, and Verifying Information supplied by customers and vendors.

**Summit Aerospace Supply, Incorporated reserves the right to request assistance through the DPAS Lead Officer of FEMA and/or DOC when required and necessary in order to comply with a customer's DPAS rated contract priorities.**

The following categories of FEMA and DHS operational programs are eligible for DPAS Support:

- Emergency Preparedness, Mitigation, Response, and Recover
- Intelligence and Warning Systems
- Border and Transportation Security
- Domestic Counter-Terrorism, including Law Enforcement
- Chemical, Biological, Radiological, and Nuclear Countermeasures
- Critical Infrastructure Protection and Restoration

## Approved Programs and Delegate Agencies

The programs listed in this chart have been approved for priorities and allocations support. They have equal preferential status. The Department of Commerce (DOC) has authorized the Delegate Agencies to use this part in support of those programs assigned to them, as indicated below.

| Program Identification Symbol | Approved Program | Delegate Agency |
| --- | --- | --- |
| Defense Programs: | | |
| A1 | Aircraft | Department of Defense. [1] |
| A2 | Missiles | DO |
| A3 | Ships | DO |
| A4 | Tank - Automotive | DO |
| A5 | Weapons | DO |
| A6 | Ammunition | DO |
| A7 | Electronic & Communications Equip | DO |
| B1 | Military Building Supplies | DO |
| B8 | Productions Equip (For Defense Contractor's Account) | DO |
| B9 | Production Equipment (Government Owned) | DO |
| C1 | Food Resources (Combat Rations) | DO |
| C2 | Department of Defense Construction | DO |
| C3 | Maintenance, Repair, & Operating Supplies (MRO) for Department of Defense Facilities | DO |
| C9 | Miscellaneous | DO |
| International Defense Programs: | | |
| Canada: | | |
| D1 | Canadian Military Programs | Department of Commerce |
| D2 | Canadian Production & Construction | DO |
| D3 | Canadian Atomic Energy Program | DO |
| Other Foreign Nations: | | |
| G1 | Certain Munitions Items purchased by Foreign Governments through Domestic Commercial Channels of Export | Department of Commerce |
| G2 | Certain Direct Defense Needs of Foreign Governments other than Canada | DO |

| | | |
|---|---|---|
| G3 | Foreign Nations (Other than Canada) Production & Construction | DO |
| Co-Production: | | |
| J1 | F-16 Co-Production Program | Department of Commerce and Defense |
| **Atomic Energy Programs:** | | |
| E1 | Construction | Department of Energy |
| E2 | Operations - Including Maintenance, Repair, & Operating Supplies (MRO) | DO |
| E3 | Privately Owned Facilities | DO |
| **Domestic Energy Programs:** | | |
| F1 | Exploration, Production, Refining, and Transportation | Department of Energy |
| F2 | Conservation | DO |
| F3 | Construction, Repair and Maintenance | DO |
| **Other Defense, Energy, and Related Programs:** | | |
| H1 | Certain Combined Orders | Department of Commerce |
| H5 | Private Domestic Production | DO |
| H6 | Private Domestic Construction | DO |
| H7 | Maintenance, Repair, & Operating Supplies (MRO) | DO |
| H8 | Designated Programs | DO |
| K1 | Federal Supply Items | General Services Administration |
| **Homeland Security Programs:** | | |
| N1 | Federal Emergency Preparedness, Mitigation, Response, & Recovery | DO |
| N2 | State, Local, Tribal Government Emergency Preparedness, Mitigation, Response, & Recovery | DO |
| N3 | Intelligence and Warning Systems | DO |
| N4 | Border and Transportation Security | DO |
| N5 | Domestic Counter-Terrorism, Including Law Enforcement | DO |
| N6 | Chemical, Biological, Radiological, and Nuclear Countermeasures | DO |
| N7 | Critical Infrastructure Protection and Restoration | DO |
| N8 | Miscellaneous | DO |
| | | |

[1] Department of Defense Includes: The Office of the Secretary of Defense, the Military Departments, the Joint Staff, the Combatant Commands, the Defense Agencies, the Defense Field Activities, all other Organization Entities in the Department of Defense, and, for purposes of this regulation, the Central Intelligence Agency and National Aeronautics and Space Administration as Associated Agencies.